FILED

05/24/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0107

DA 20-0107

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 96

STATE OF MONTANA,

> Plaintiff and Appellee,

v.

MICHAEL ALLEN ZEIMER,

> Defendant and Appellant.

APPEAL FROM: District Court of the Seventh Judicial District,
In and For the County of Dawson, Cause No. DC 19-49
Honorable Olivia C. Rieger, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Samir F. Aarab, Boland Aarab PLLP, Great Falls, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Michael P. Dougherty,
Assistant Attorney General, Helena, Montana

Brett Irigoin, Dawson County Attorney, Glendive, Montana

Submitted on Briefs: November 17, 2021

Decided: May 24, 2022

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Michael Allen Zeimer (Zeimer) appeals from his December 24, 2020 convictions in the Montana Seventh Judicial District Court, Dawson County, on the offenses of felony criminal possession of dangerous drugs (methamphetamine) and misdemeanor criminal possession of drug paraphernalia. Zeimer asserts that the convictions are invalidly based on evidence seized as the fruit of an unlawfully-prolonged investigatory traffic stop. We address the following dispositive issue:

> *Whether the District Court erroneously denied Zeimer's motion for suppression of evidence discovered upon a vehicle search that resulted from an unlawfully prolonged investigative DUI stop?*

We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 At approximately 9:00 a.m. on April 15, 2019, a deputy Dawson County Sheriff (Deputy 1) responded to the Town Pump Travel Center in Glendive, Montana,[1] on an employee's 911 report that a vehicle was irregularly parked in the rear parking lot of the truck stop with the driver slumped over the steering wheel. At the subsequent suppression hearing, Deputy 1 characterized the 911 dispatch as a "a welfare check." He further acknowledged on cross-examination that the report stated nothing more than that a pickup truck was parked "irregularly," perpendicular to and across several striped parking spaces in the rear parking lot, with someone "slumped over their steering wheel," "sleeping."

---

[1] The subject Town Pump Travel Center is a combined gas station, truck stop, convenience store, and casino located near the intersection of Interstate 94 and State Highway 16 in or about Glendive, Montana.

2

Initial Investigatory Stop

¶3      Deputy 1 testified that, upon his arrival at the truck stop, he saw the pickup irregularly parked as described in the 911 report. He recounted that, as he approached, he saw the driver, later identified as Zeimer, "appear[] to look up from the steering wheel, check his mirrors," and then notice the approaching patrol car. He testified that, though he could not tell whether the truck's engine was already running, Zeimer "proceeded to drive [forward] . . . in a slow . . . circle . . . around to the frontside" of the store, where he properly parked in a lined parking space. The deputy's body-cam recording, admitted into evidence at the suppression hearing, did not capture his initial observations upon arrival. It first captured Zeimer as he exited his truck after parking in front of the store and then calmly walked forward to the front corner of his truck where he stopped and waited for the deputy to approach on foot.[2] As Zeimer exited his vehicle, the deputy pulled in and parked in the lined parking space next to Zeimer's truck and then immediately walked over and personally engaged him.

¶4      Deputy 1 testified that, based on his training and experience, the "suspicious" circumstances observed upon his arrival (i.e., the manner in which the truck was parked perpendicular across the lined parking spaces with the driver slumped over the steering wheel, the driver's decision to move and drive around to the front of the store on approach of the patrol car, and his "slow driving" around the front of the building with turns that were "rounded and slow" rather than "sharp" or "crisp") were "usually" indicative of

_____

[2] The deputy did not at any time activate his patrol car top lights or siren.

3

"somebody who [was either] impaired or suffering from a medical condition." In further describing his thought process at the time, the deputy explained that, in trying to assess which, if not both, of those possible scenarios might be the case, he intended to first check on Zeimer's welfare and then attempt to ascertain whether he had been driving under the influence (DUI) of alcohol or drugs.[3]

<u>Initial Questioning: Zeimer's Identity, Explanation of his Presence and Circumstance, and Attempt to Ascertain Any Indicia of Impairment</u>

¶5 Upon engaging Zeimer at the front of his truck, Deputy 1 identified himself and inquired as follows:

[Deputy 1]: How are you doing?

[Zeimer]: Good.

[Deputy 1]: . . . Alright. . . . We had a welfare check asked to be done on ya. . . . Were you sleeping in the pickup . . .?

[Zeimer]: Ya, I just, I pulled in here. I just got done driving from, from Miles City and, uh, . . . [inaudible] [another sheriff's deputy (Deputy 2) then walks into frame from the left behind Zeimer's truck and begins looking into the truck bed]

[Deputy 1]: Ok, ok, you're on your way from, from Miles City, is that what you said?

[Zeimer]: Ya, I came through last night.

[Deputy 1]: Oh, ok. Do you have a driver's license on you, sir? Anything like that?

---

[3] In April 2019, it was "unlawful . . . for [a] person" "to drive or be in actual physical control of a vehicle upon the ways of [Montana]" while "under the influence" of alcohol or a drug. Section 61-8-401(1)(a), MCA (repealed and superseded by 2021 Mont. Laws ch. 498 (restructuring Montana DUI laws)). Montana law provided that, for purposes of DUI, a person was "under the influence" if his or her "ability to safely operate a motor vehicle [was] diminished" "as a result of taking into the body alcohol, drugs, or any combination thereof." Section 61-8-401(3), MCA (repealed and superseded by 2021 Mont. Laws ch. 498).

[Zeimer]:    Sure. [Reaches into coat pocket]

[Deputy 1]: Where're you headed to?

[Zeimer]:    Actually, I'm waiting for my sister.

[Deputy 1]: Oh, ok. [Zeimer pulls wallet from inside coat pocket and hands his driver's license to the deputy] She's going to meet up with you here?

[Zeimer]:    Yep.

[Deputy 1]: Ok. [Examines driver's license] Michael Zeimer, is that right?

[Zeimer]:    [Affirmatively nods head]

[Deputy 1]: Ok.

[Zeimer]:    I'm from here in Glendive and I just haven't . . . [inaudible]

[Deputy 1]: Ok, ok.  So, ah, you were driving this morning, you said?

[Zeimer]:    Yeah, . . . I just pulled in there and I didn't know what, what time it was so I just thought . . .

[Deputy 1]: Ok, ok, um, I did notice, and that's kind of how the, one of the things about the call was that, uh, when you parked, you parked sideways across the parking spots . . .

[Zeimer]:     Ok, ya I did, I did. I [inaudible] by the door, by the door [pointing towards the rear door of the casino/store] . . .

[Deputy 1]: Ok, are you waiting for somebody that's in the casino . . . ?

[Zeimer]:    [Briefly looks away] . . . I just, I just actually called her and she said she was going to be here.

[Deputy 1]: Ok, what's your sister's name, sir?

[Zeimer]:    Janet Seymore.

[Deputy 1]: Janet Seymore? [Zeimer nods affirmatively] Ok and, ah, are you guys meeting up for breakfast, er, what's the . . .

5

[Zeimer]:    Actually, I'm still moving in with her. . . . I'm just . . . [inaudible] moving back here, and I . . . [am going to be] living with her—her husband just, just passed away in January.

[Deputy 1]: Ok, ok, ya, I think I visited with her before and talked to her a bit about it.[4]  So, um, . . . she's going to meet you here for, what, are you guys gonna get, coffee or what, what's going on?

[Zeimer]:    She just said to meet her here and . . . [inaudible], I'm supposed to go out to her house.

[Deputy 1]: Ok.  Are you not allowed to go to her house by yourself, or what?

[Zeimer]:    No, we had . . . had a problem, but . . . [inaudible]

[Deputy 1]: Ok, kind of getting things figured out?

[Zeimer]:    Yeah, I think we got things worked out.

[Deputy 1]: Ok, were you living in Wibaux for a while?

[Zeimer]:    [Looks back over his shoulder and watches Deputy 2 walk over from right of frame to back of Zeimer's truck and again look into his truck bed]  Was I living in Wibaux?

[Deputy 1]: Ya.

[Zeimer]:    Uh, [pensively looks down and pauses] a long time ago.

[Deputy 1]: A long time ago?  Ok, not recently though?

[Zeimer]:    No. I haven't lived in Wibaux for at least eight years.

[Deputy 1]: Eight years, oh, ok, ok.

---

[4] The deputy testified at the suppression hearing that he had previously "spoken with Janet Seymore" "three months" earlier "about another case involving [Zeimer]."

The deputy then presumptively questioned Zeimer non-sequitur about his prior association with another individual (Rob Hammonds) who had no apparent involvement or relationship to the DUI investigation, to wit:

[Zeimer]: Spent some time up in Glendive, Miles City, Fairview.

[Deputy 1]: Oh, ok, ok. When's the last time you saw Rob Hammonds?

[Zeimer]: Rob Hammonds, [pensively pauses] about [pauses], probably two months ago.

[Deputy 1]: Two months ago?

[Zeimer]: Yep.

[Deputy 1]: Ok, ok, where was that at?

[Zeimer]: Fairview . . . yeah, . . . worked with him in Fairview.

[Deputy 1]: Ok, ok.

[Zeimer]: [Inaudible]

The questioning then returned to questions regarding Zeimer's presence and circumstances at the truck stop, and his motor vehicle registration and liability insurance compliance:

[Deputy 1]: Ok. Do you have a registration and insurance and everything?

[Zeimer]: Yeah. [Returns to truck door, opens it, and retrieves a piece of paper from driver's side visor, looks at it, returns to front of vehicle, hands registration to Deputy 1, and returns to truck door] . . . [I'm] . . . buying the truck.

[Deputy 1]: What's that?

[Zeimer]: I'm buying the truck from Scott Miller.

[Deputy 1]: . . . Ok.

[Zeimer]: [Inaudible] [returns other paperwork to the visor]

7

[Deputy 1 hands registration to Deputy 2 who walks out of frame—Zeimer walks back to driver's door and continues search for insurance card above visor]

[Zeimer]:  [Closes truck door] I can't find the insurance paper . . . [closes door and steps forward to Deputy 1]

[Deputy 1]: Can't find the insurance paper, ok.  Does it have insurance on it, er?

[Zeimer]:  As far as I know, yes.

[Deputy 1]: As far as you know?

[Zeimer]:  Ya, . . . [inaudible] Scott Miller.

[Deputy 1]: Ok, um, so you're buying the pickup from Scott?

[Zeimer]:  [Nods affirmatively]

[Deputy 1]: Ok.

[Zeimer]:  Ya, I work with him too.

[Deputy 1]: Ok, what a, do you know when Janet is supposed to be here?

[Zeimer]:  She didn't say.  She has a paper route here in Glendive.

[Deputy 1]: Oh, ok, ok, alright.  Well, ah, so, with, with the way you parked the pickup and stuff, I guess, like I said, not sure why you did that.  So, I, either you've been drinking—

[Zeimer]:  Nope, I don't drink—

[Deputy 1]: Ok, you don't drink at all?

[Zeimer]:  Nope.

[Deputy 1]: Oh, well that's good.  So what time did ya drive this morning?

[Zeimer]:  [Inaudible] three o'clock [and was] tired when I pulled in here.

[Deputy 1]: Three o'clock, ok.  You might have been tired, that might have been why you parked that way?

8

[Zeimer]: [Inaudible] . . . tired.

<u>Transition to Investigation of Zeimer's Inconsistent Account of His Presence and Circumstances at the Truck Stop</u>

¶6    Having, as manifest in the body-cam recording, apparently observed no confirmatory particularized indicia of actual alcohol or drug impairment, the deputy's questioning then focused on challenging Zeimer's seemingly odd and inconsistent account of his presence and circumstances at the truck stop prior to the deputy's arrival:

> [Deputy 1]: Ok, ok, alright, Mr. Zeimer, one second [pause]. Were you getting ready to go inside [the casino], is that—
>
> [Zeimer]:   Yeah, ah, that's what I was gonna do . . . see if [inaudible] in there.
>
> [Deputy 1]: Were you gonna see if she's inside?
>
> [Zeimer]:   Yeah.  Far as I know, she drives a gold-colored van.
>
> [Deputy 1]: Ok.  She drives what kind of van?
>
> [Zeimer]:   A van, ah, . . . like this one right here [points to parked van].
>
> [Deputy 1]: Ok, ok. [Pauses and looks at his cell phone]  You got her phone number, on ya?
>
> [Zeimer]:   [Shrugs shoulders, gives seven-digit number].

After calling and speaking with Zeimer's sister and ascertaining that she had no idea as to what Zeimer was talking about, the deputy continued to aggressively challenge Zeimer about his seemingly inconsistent story:

> [Deputy 1]: Alright Mr. Zeimer, here's the deal, why are you bullshitting me?
>
> [Zeimer]:   Ah, I'm not—

[Deputy 1]: You are.  I just talked to Janet, she had no idea what you're talking about.  She's not planning on meeting you here.  So who are you here to meet?

[Zeimer]: Nobody.

[Deputy 1]: Ok, then why would you tell me you're here to meet your sister?

[Zeimer]: I talked to her last night, . . . [inaudible] I called her last night and she said meet her down here this morning, that was it, we were talking about getting things straightened-up between us.

Pat-Down/Frisk and Clothing Search

¶7    Unable to get a more credible and acceptable explanation for Zeimer's presence at the truck stop, and without any apparent indication of a particularized basis upon which to suspect that Zeimer may have been armed and dangerous, Deputy 1 stated his intent to conduct a protective officer "safety" pat-down of Zeimer. His body-cam recording manifested no overt indication that Zeimer was in fact armed or dangerous, however.  Nor did he articulate any such indication or actual suspicion on the recording or subsequently at hearing.  In any event, the purported protective search then proceeded:

[Deputy 1]: Why don't you go ahead and turn-around, I'm going to frisk you for weapons, do you have any weapons on you?

[Zeimer]: I've got a pocketknife on my side here.

[Deputy 1]: Ok, go ahead and turn around, you're not under arrest, ok, but I'm going to frisk you for my safety, ok.  So, I'm not sure why you're lying to me about what's going on. [Begins pat-down search of Zeimer's body]  Do you have a pocket knife?

[Zeimer]: [Inaudible]

[Deputy 1]: Ok, is there anything else on you? [Reaches into and retrieves something from Zeimer's pocket and then pats-down his front pants pocket] What's that there [in reference to a two-prong hand tool handle

10

visibly protruding from his pants pocket]? Pliers. [Pat-down then continues] Just checking for weapons, sir. You don't have knives, other knives, firearms, anything like that?

[Zeimer]: No.

[Deputy 1]: On your person? [Continues pat-down and reaches into Zeimer's coat pocket] Billfold?

[Zeimer]: Should be [inaudible] wallet, er, my other license—

[Deputy 1]: It's something round, what, what do you got going on up here [in your coat]?

[Zeimer]: [Inaudible] I'm not sure.

[Deputy 1]: You're not sure?

[Zeimer]: Nope.

[Deputy 1]: Ok [continues pat-down], like, [pauses] you're not sure what this is up here? . . . You, you don't have any idea.

[Zeimer]: I have—

[Deputy 1]: Ok, you alright with me taking it out then, if you don't know what it is?

[Zeimer]: Ya, ok.

[Deputy 1]: Ok, it's not something sharp and pokey, that's going to hurt me? Is it on the inside [coat] pocket?

[Zeimer]: Yup.

[Deputy 1]: You're not sure what it is? [digging into coat and pulls out two items and reaches back in and pulls out another] Electrical tape?

[Zeimer]: Yep.

[Deputy 1]: Ok, that's probably what I was feeling mostly, there's something else in there [as he reaches into inside coat pocket and retrieves something]. Pens?

11

[Zeimer]:    Ya, [inaudible].

[Deputy 1]: Ok, you still have more hard stuff down at the bottom, no idea?

[Zeimer]:    [Inaudible]

[Deputy 1]: Ok, I'm going to let go of your hands, but I'm going to take another look in here, ok, just keep them back there, thank you [and then continues reaching into Zeimer's inside coat pocket].

[Deputy 2]: Hold on to your fingers, ok?

[Zeimer]:    Yep.

¶8      The deputy then pulled out a set of keys from Zeimer's pocket, resumed digging in the pocket, pulled out another item, examined it and reached back into the pocket. Finding nothing more, the deputy told Zeimer to put the removed items back in his pocket and the questioning resumed:

[Deputy 1]: . . . Ok, why are you lying about why you're here?

[Zeimer]:    [Shakes his head negatively while replacing items into his coat]  I'm not.

[Deputy 1]: You obviously are, I just talked to Janet, I just told you that, she has no idea what you're talking about.

[Zeimer]:    I'm not here to meet anybody, just my sister.

[Deputy 1]: Right, but your sister, she doesn't know anything about meeting you here, which means you're lying to me. [pause]  You better start telling me the truth or we're going to have more problems than just checking on ya, right?

[Zeimer]:    I'm not here to meet anybody, nobody at all, not even my sister.

Deputy 2 joined in and the questioning continued:

[Deputy 2]: Where do you live at?

12

[Zeimer]:    I was living with Janet.

[Deputy 2]: Say again.

[Zeimer]:    I was living with Janet.

[Deputy 2]: Ok, where're you living at now?

[Zeimer]:    I'm not.

[Deputy 1]: You don't have a place anywhere around here?

[Zeimer]:    [Points at his truck] Right here is where I'm living.

[Deputy 1]: You spent the night there last night?

[Zeimer]:    Right here, yep.  Right back, that's where I parked . . .

[Deputy 2]: Where'd you come from?

[Zeimer]:    What's that?

[Deputy 2]: Where'd you come from?

[Zeimer]:    Right here in town.

[Deputy 2]: Where at though?

[Zeimer]:    Just driving around town.

[Deputy 2]: You just drove around town all night and then came here to sleep?

[Zeimer]:    [Inaudible]

[Deputy 2]: Does that make any sense to you?

¶9     At this point, the continuing colloquy between Deputy 2 and Zeimer became inaudible on Deputy 1's body-cam recording as he stepped away behind Zeimer and began searchingly looking into both sides of his truck bed and cab.  Upon Deputy 1's return to

13

the front of the truck, his body cam captured Deputy 2 directing Zeimer to "pull off your sunglasses." Zeimer complied and the questioning continued:

[Deputy 2]: You just drove around town all night.

[Zeimer]:    [Nods affirmatively]  Yep.

[Deputy 2]: You still didn't tell [the other deputy] what you're doing here.

[Zeimer]:    [J]ust sleeping in the truck.  That's it.

[Deputy 2]: You said you were meeting your sister, that turned to be false.

[Zeimer]:    Yes, it was.

[Deputy 2]: Why are you lying?

[Zeimer]:    I didn't have any place to stay.

[Deputy 2]: That's nothing to lie about.

[Zeimer]:    Well, that's nothing to be proud of.

[Deputy 1]: You could've told me you were living in your pickup, it wouldn't have mattered to me any, right?

[Zeimer]:    [Nods affirmatively]

[Deputy 1]:  I figured something else was going on because, usually when someone lies to me, it's because they're covering something else, right?

[Zeimer]:    [Nods affirmatively] That's what it sounds like, ya, but I didn't have any place to live.

Initial Deputies Consultation on Dead-End and Transition to Focused Drug Investigation

¶10    After the investigative questioning again dead-ended, the deputies stepped away from Zeimer to consult. While the first part of their conversation is inaudible, Deputy 1's body cam captured him saying, "I tried smelling him for alcohol, *I can't smell anything,*

14

*but I don't know* [inaudible] I can check him for priors [inaudible]." (Emphasis added.) The body cam recording reflects no articulation by either deputy of any particularized indication that Zeimer in fact may have been impaired. After consulting further, they returned to Zeimer, still standing patiently outside his truck, and Deputy 1 began accusatorily questioning him about drug use:

[Deputy 1]: Mr. Zeimer, you, ah, do you use drugs?

[Zeimer]: No, I do not. I watched my brother, both my brothers go through it, I see no reason.

[Deputy 1]: No reason for it, okay. Well, I've heard from your family that you're into drugs, okay, so I already know that, that, that's the deal–

[Zeimer]: A while ago, yes, I was.

[Deputy 1]: A while ago, how long's a while ago?

[Zeimer]: About, two years ago.

[Deputy 1]: Two years ago, ok.

[Zeimer]: Yep.

[Deputy 1]: Ok, so, ah, [inaudible]

[Zeimer]: . . . Two years ago, I bet I was.

[Deputy 1]: Ok, what, did you do some more last night?

[Zeimer]: No, I did not. I was over at, ah, I seen Steven Yurian, and I helped him move some stuff—

[Deputy 1]: Steve Yurian?

[Zeimer]: Yeah, he's moving. I helped him move a little bit of stuff because he worked with us too. I got tired, I came up here.

[Deputy 1]: Where's Steve at?

15

[Zeimer]:    He lives over in that trailer court by, ah, ah, [inaudible]

[Deputy 1]: By who?

[Zeimer]:    By [inaudible]

[Deputy 1]: Ok, the one right here across the Interstate?

[Zeimer]:    Yeah, down here [points to his left]

[Deputy 1]: Down there, ok.  So, you didn't hit up before you came over here and went to sleep?

[Zeimer]:    No, nope.

[Deputy 1]: Okay, I mean, you haven't told me the truth about anything that I've asked you about yet.  I mean, even, you just said that you don't use drugs and then you just said you used drugs, you know—

[Zeimer]:    Two years ago [shrugs shoulders], yeah.

[Deputy 1]: Two years ago.  Right.  But that's, you, you have obviously used drugs, right?

[Zeimer]:    Yeah, two years ago, yeah.

[Deputy 1]: So, and you lied about meeting your sister here.  Absolutely nothing you're saying right now is making sense.

[Zeimer]:    [Shrugs shoulders and hands]

[Deputy 2]: What time did you get done doing this work for this guy?

[Zeimer]:    About two-thirty [or] three.

[Deputy 2]: And then you just came straight here?

[Zeimer]:    Yep.

[Deputy 2]: So why did you just tell me you got done driving around, if that's all you were doing last night?

[Zeimer]:   Before I met up with him that's what I was doing, just driving around. Then stopped here for a little bit.[5]

Second Consultation, Acknowledgment of Dead-End, and Stated Need to "Turn This Thing Into" a Drug or DUI Investigation

¶11    Still unable to get a more credible and acceptable account of Zeimer's presence and preceding activities, the deputies once more stepped away from him to consult on what to do next:

[Deputy 2]: We're still waiting on the returns [inaudible]. *I think we gotta either turn this thing into . . . a narcotics thing, or DUI.* I don't know, if you want to ask him, you could ask him [inaudible] for [inaudible] an HGN[6] or something [inaudible]. So ya, [inaudible]

[Deputy 1]: It's your call, sorry. I was trying to back you up—

---

[5] Deputy 1 testified at the suppression hearing that Zeimer's "demeanor . . . seemed nervous" while they spoke, and further asserted that then "one thing [Zeimer] did the entire time" was to "continue[] to look at his pickup"—"[h]e would actually stare at his pickup for, um, long periods of time" and "would usually turn away from me when he was talking to me or answering any questions." He testified that, "[b]ased on [his] training and experience," such conduct "can be an indication of deception." Aside from the only generalized nature of that asserted indication, Deputy 1 did not mention at hearing, as clearly indicated on his body-cam recording, that Zeimer's large dog was moving around in the cab of his truck during the questioning, and that Zeimer generally looked back at the truck briefly only once when he saw one of the deputies moving around behind or across from him, searchingly looking into the cab and bed of the truck while the other continued to question him near the front of the vehicle.

[6] HGN is the acronym for a standard field sobriety test known as the Horizontal Gaze Nystagmus. The HGN test generally requires the subject to look forward and visually track the administering officer's finger or hand-held object as the officer moves it from side-to-side across the subject's field of vision and assesses whether the subject's eyes are able to smoothly track from side-to-side and whether they manifest involuntarily jerking at 45 degrees and maximum deviation on each side. *See Hulse v. Mont. Dep't of Justice Motor Veh. Div.*, 1998 MT 108, ¶ 66, 289 Mont. 1, 961 P.2d 75. The HGN test is a science-based test based on a rough correlation between blood-alcohol content and the corresponding impairment of the ability of the subject's eyes to smoothly track from side-to-side and the manifestation of involuntarily eye-jerking at 45 degrees and maximum deviation on each side. *See Hulse*, ¶ 66. The officer then must give a standardized score of the subject's performance on each criteria for each eye with the total score indicative of alcohol-related impairment above-specified threshold total score. *See Ditton v. Mont. Dep't of Justice Motor Veh. Div.*, 2014 MT 54, ¶ 6, 374 Mont. 122, 319 P.3d 1268; 9 Am. Jur. Proof of Facts 3d 459 (1990).

[Deputy 2]: Hey man, take [inaudible], take point [chuckles].

(Emphasis added.) When they returned to Zeimer, who was still patiently standing outside his truck waiting, Deputy 2 took a crack at questioning him regarding the aforementioned "narcotics thing":

[Deputy 2]: So do you have anything in the vehicle we should know about?

[Zeimer]:    [Negatively shakes head]. No.

[Deputy 2]: No, ok, do you have any, uh, prescription pills in there?

[Zeimer]:    [Negatively shakes head]. Not that I know of.

[Deputy 2]: Not that you know of, ok, do you have any marijuana in there?

[Zeimer]:    No.

[Deputy 2]: Heroin?

[Zeimer]:    [Negatively shakes head] Uh-uh.

[Deputy 2]: Crack?

[Zeimer]:    [Shakes head and responds negatively].

[Deputy 2]: Cocaine, methamphetamine?

[Zeimer]:    [Negatively shakes head]. No.

[Deputy 2]: No, when's the last time you used?

[Zeimer]:    Two years ago.

[Deputy 2]: Um, so here's the deal, ok, all, all the questions he's been asking, we've been asking ya, you can't give us a good answer on, ok. You've been lying to us ever since, ok, alright. Does that seem odd to you that somebody would do that if they're not doing anything that they're not supposed to be doing?

18

[Zeimer]:  I'm not lying.

<u>Return to DUI Investigation Upon Dead-End of "Narcotics Thing" Questioning</u>

¶12    With the "narcotics thing," i.e. illegal drug possession questioning, having again dead-ended, Deputy 2 shifted the focus of the investigation back to the original purpose of the stop—the DUI investigation:

[Deputy 2]:  Ok, well you already [lied], and you already admitted to it, ok, um, so, do you, don't take offense to this or anything, but, I mean, do you usually talk slow and slurred and tired sounding?[7]

[Zeimer]:  I don't have any teeth in the front [points to his mouth].

[Deputy 2]: Ok, ok, that's why?

[Zeimer]:  Yep.

[Deputy 2]: Ok, you didn't use anything last night, this morning?

[Zeimer]:  No.  I've been here.

[Deputy 2]: Been here, but prior to that you were doing what?

[Zeimer]:  Driving around.

[Deputy 2]: Driving around—

[Zeimer]:  Helping Steve Yurion move some stuff.

[Deputy 2]: Ok, well, just so I can rule out the fact you could be intoxicated, I'm just going run, run a couple of tests on ya, ok, does that make sense, have you been through 'em before?

[Zeimer]:  Nope.

---

[7] Other than pensive pauses in response to the deputies' repeated questioning, the body-cam recording does not support the deputy's conclusory characterization of Zeimer's speech as slurred or slow.

19

[Deputy 2]: Ok, alright, why don't you come over here real quick for me, ok.

(Emphasis added.)  At this point, over 20 minutes into the investigatory DUI stop, Deputy 2 walked Zeimer away from his truck and subjected him to field sobriety testing.

Field Sobriety Testing

¶13     After subjecting him to HGN testing, Deputy 2 led Zeimer back towards his truck and instructed him to stand on a parking space line, where he sequentially instructed and directed him to accordingly perform two other standard field sobriety tests—the nine-step walk-and-turn and the one-leg stand.[8]  The body-cam recording shows Zeimer compliantly listening and performing both tests, after advising that he had a problem with one of his legs.  Neither the body-cam recording that captured the testing, the patrol car dash-cam recording of subsequent events later in the stop, nor Deputy 1's trial testimony captured or included any articulation of how Deputy 2 may have scored Zeimer's performance of any of those tests as an indicator of alcohol- or drug-related impairment.  After subjecting him to the requested field sobriety testing, Deputy 2 advised Zeimer, "so, [Deputy 1] has a little bit of time to kill, ok," and "I got one more test for ya" to perform.

---

[8] The walk-and-turn and one-leg stand tests require the subject to stand still in specified positions while the administering officer instructs the subject how to perform each exercise.  *See* 9 Am. Jur. Proof of Facts 3d 459 (1990).  The officer then directs the subject to perform the exercise as instructed and monitors and grades the subject's performance based on his or her ability to stand and perform the various physical maneuvers required by each test.  Each test results in a checklist grading total, which at or above the specified threshold score for each test, is viewed as a general indicator of some degree of physical impairment which the officer may then consider, in conjunction with other observed indications of common alcohol-related impairment, in the assessments of whether particularized suspicion exists justifying other more intrusive field sobriety tests and/or whether probable cause exists for an arrest on suspicion of an alcohol or drug related driving impairment offense.  *See Ditton*, ¶ 6; 9 Am. Jur. Proof of Facts 3d 459 (1990).

20

Detention in Locked Patrol Car

¶14    The deputies then directed Zeimer to Deputy 1's patrol car and, without further explanation, directed him to sit down in the back seat. After one of them closed the locked car door behind Zeimer, the deputies walked around to the other side of the patrol car. The body-cam recording captured one of them referring to an unidentified piece of equipment, presumably a later-produced portable breath test/preliminary alcohol screening (PBT/PAST) device. At that point, Deputy 1 disabled his body cam and the recording ended. He testified at hearing that the body-cam recording "accurate[ly] reflect[s]" what he saw and what happened that day. Based on the body-cam timer, 30 minutes had elapsed from the time that Deputy 1 first stopped and made contact with Zeimer.

Pre-PBT/PAST Patrol Car Detention and Request for Consent to Search Truck

¶15    Upon the confinement and detention of Zeimer in the backseat of the patrol car, the dash cam turned around and recorded his detention in the patrol car.[9] A few minutes later, Deputy 2 returned, opened the rear door, and further engaged Zeimer:

> [Deputy 2]: Ok, um, so just real quick, you are being detained for a DUI investigation right now, ok? Um, I'm just going to read your *Miranda* rights, ok, . . . [then reads *Miranda* advisory] Do you understand [your rights]?
>
> [Zeimer]:    [Nods affirmatively] Yeah.
>
> [Deputy 2]: Is there anything in the [truck] we should know about?
>
> [Zeimer]:    [Shakes head negatively] Nope.
>
> [Deputy 2]: Ok, that being said, would you consent to a search?

---

[9] The dash-cam video was admitted into evidence at the suppression hearing.

[Zeimer]:    [Shakes head negatively] It's not my vehicle.

[Deputy 2]: Well, you're, you're in control of it and you've been living in it, right?

[Zeimer]:    Yep.

[Deputy 2]: So—

[Zeimer]:    Yep—

[Deputy 2]: You're ok with that?

[Zeimer]:    Yep.

[Deputy 2]: Alright, it's, got some paperwork for you to fill out, ok?

[Zeimer]:    Ok.

[Deputy 2]:  [Closes backseat door and walks away]

The deputy returned a few minutes later, opened the patrol car door, and asked Zeimer to verify his phone number and current address.  The deputy then presented a vehicle search consent form:

> [Deputy 2]:  Alright, so this is a consent search form, ok, um, saying that a, you, you'll sign it, um, . . . [summarizes prefatory language of the form] you hereby authorize . . . [Deputies 1 and 2 of] the Dawson County Sheriff's Office, um, to search your property, particularly described as your brown Ford Ranger bearing Montana plate . . .  Ok, ah, you further authorize us to remove from your possession or the vehicle any documents or items of property deemed necessary for our investigation. It says you're giving, ah, your written permission freely and voluntarily without threats or promises having been made and after having been informed by us that you can stop, refuse, or limit the search, make sense?

> [Zeimer]:    Yeah.

> [Deputy 2]: You ok with that?

22

[Zeimer]:    Yeah.

[Deputy 2]: Ok, so then sign right there for me.

[Zeimer]:    [Takes and signs form]

[Deputy 2]: Alright,. . . . [will] you . . . step [out] and grab your dog for me.

After Zeimer compliantly got out and retrieved his dog from his truck, one of the deputies directed him to stand next to the Town Pump building with his dog. While Deputy 2 searched the vehicle, Deputy 1 stood next to Zeimer and continued to ask him questions about his work and personal relations, when he last saw Rob Hammonds, and whether he was on probation. After about eight minutes, Deputy 2 returned from searching the vehicle and directed Zeimer to put his dog in the back of Deputy 2's vehicle. After securing the dog, Deputy 2 asked Zeimer if he had "any idea what I found," accused him of having "lied to us about everything up 'til here," revealed that he had found contraband in his truck, and advised that he was placing Zeimer under arrest for "possession of dangerous drugs and paraphernalia." Deputy 2 then handcuffed Zeimer and placed him in the back seat of Deputy 1's vehicle and closed the locked door. Based on the patrol car dash-cam timer, over 17 minutes passed from the time that the deputies initially detained Zeimer in the locked patrol car for continuation of the purported DUI investigation after he performed the requested field sobriety tests. At this point, Zeimer had been detained on the investigative stop for 47 minutes.

Continued Detention, Truck Search, and PBT/PAST Administration

¶16    After the truck search, Deputy 2 returned and read Zeimer the Montana implied consent advisory pursuant to § 61-8-409, MCA (2015) (implied consent to PBT/PAST

23

screening on particularized suspicion of DUI—repealed and superseded by 2021 Mont. Laws ch. 498).  Zeimer consented and submitted to a PBT/PAST test that returned a .000 blood-alcohol concentration result.  Deputy 2 left again with Zeimer still detained in the backseat of the patrol car.

<u>DUI Arrest, Charged Offenses, and Suppression Motion</u>

¶17	Upon returning to the patrol car a few minutes later, Deputy 2 advised Zeimer that he was now also under arrest for DUI based on "alcohol and/or drugs[,] [d]rugs in this case."  The deputy then read him a Montana implied consent advisory pursuant to § 61-8-402, MCA (2015) (implied consent to post-arrest/probable cause based arrest breath test or blood draw for laboratory analysis of measured amounts of blood-alcohol or drug content—repealed and superseded by 2021 Mont. Laws ch. 498).  Following the advisory, Zeimer refused to submit to the requested DUI blood draw.  Deputy 2 left briefly and, upon his return, verified Zeimer's blood draw refusal, obtained his consent for release of his dog to his sister, and seized his driver's license pursuant to § 61-8-402, MCA (2015) (seizure of license upon implied consent refusal).  Deputy 1 then transported Zeimer to the Dawson County detention center.[10]  The State initially charged Zeimer with felony possession of

---

[10] In the affidavit in support of the State's Motion for Leave to File an Information against Zeimer, the county attorney attested that law enforcement did not seek a search warrant for a court-ordered DUI blood draw because Zeimer had no prior DUI convictions.  *See* § 61-8-402(5), MCA (2015) (express legislative authorization for DUI search warrant upon subsequent implied consent refusal by person previously convicted of DUI or similar offense).  *See also City of Missoula v. Williams*, 2017 MT 282, 389 Mont. 303, 406 P.3d 8 (construing § 61-8-402(5), MCA (2011)).

24

methamphetamine, misdemeanor DUI (1st offense), and misdemeanor possession of drug paraphernalia.

¶18 Zeimer later moved to suppress the suspected methamphetamine and glass pipes on the asserted ground that they were seized in violation of the warrant and probable cause requirements of the Fourth Amendment and Mont. Const. art. II, § 11. His initial written motion and briefing acknowledged that the responding deputy initially may have had sufficient particularized suspicion to justify a Community Care Doctrine (CCD) welfare check, but that the constitutional justification evaporated and was dispelled before the actual stop when the deputy saw him attempt to drive away in a lawful manner with no particularized indication of distress, peril, or need for assistance. At the suppression hearing, the State conceded that the initial particularized suspicion justifying a CCD welfare check stop disappeared before the stop, but asserted that the deputy nonetheless had sufficient particularized suspicion that Zeimer may be DUI, in violation of § 61-8-401, MCA (2015), thus justifying the stop as an investigative DUI stop with associated field sobriety testing.[11]

¶19 As a preliminary matter, the District Court agreed with the State that a CCD welfare check "was no longer necessary to render aid" after Zeimer "apparently awoke and drove

---

[11] Below, the State initially attempted to characterize the encounter as a consensual citizen-police encounter, not rising to the level of a seizure. Despite ambiguous language apparently referring to consensual citizen-police encounters, the District Court ultimately concluded, however, that it was a valid investigative stop based on particularized suspicion of criminal activity. The State's primary assertion on appeal, that the District Court correctly concluded that Deputy 1 validly stopped Zeimer on particularized suspicion of DUI, tacitly, if not explicitly, concedes that the encounter was, under the totality of the circumstances, a warrantless constitutional seizure of Zeimer, thus invoking the *Terry* investigative stop exception to justify it.

to the front of the property." The court denied the motion to suppress, however, on the stated ground that the deputy's initial stop of Zeimer in front of the building was lawful based on a reasonable particularized suspicion of DUI. The court found that the deputy initially had sufficient particularized suspicion of DUI based on his observations of: (1) Zeimer slumped over the steering wheel of his truck at 9:00 a.m. in the rear parking lot; (2) the position of Zeimer's truck parked irregularly across and perpendicular to the striped parking spaces; (3) Zeimer's attempt to drive away upon seeing the deputy approach; (4) his "very slow" driving around to the front of the building in a manner "slower than what the Deputy has experienced in the same parking lot"; (5) his unusually "rounded turns" as he drove around the building; and (6) the lack of any apparent need to drive around to the front to enter the building when he could have more readily entered through the rear door located in more immediate proximity to "where he was originally parked." The court then essentially concluded further that the deputies thereafter lawfully extended the scope and duration of the investigatory stop based on the articulated facts that: (1) Zeimer's "story did not seem to make sense to the Deputy based on his experience"; (2) his story was contradicted by what his "sister had previously told the Deputy"; (3) "it was not logical that [Zeimer] would drive all night from Miles City just to sleep at the Town Pump" truck stop if, as he asserted, "his final destination was [his] sister's home . . . approximately one mile away"; and (4) Zeimer "seemed to avoid looking at the deputy during [the] conversation which the Deputy [then] believed to be an indicator of untruthfulness based on his training and experience." The court thus reasoned that "[s]ufficient circumstances exist[ed], based on the totality of the circumstances, that

26

allowed [the deputy] to make certain inferences . . . resulting [in] suspicion that [] Zeimer was engaged in wrongdoing at the time." The District Court did not specify, however, what particular type of "wrongdoing" the deputy suspected Zeimer may have been engaged in.

Guilty Plea, Sentencing, and Appeal

¶20 Following the denial of the suppression motion, Zeimer pled guilty under a plea agreement to felony possession of methamphetamine and misdemeanor possession of drug paraphernalia with reservation of right to appeal the suppression motion denial. In return, the State dismissed the DUI charge. The District Court subsequently sentenced Zeimer to a suspended five-year year term of commitment to the Montana Department of Corrections for placement in an appropriate correctional facility or program, subject to various conditions of probation including, *inter alia*, successful completion of the court's Adult Treatment Court program. Zeimer timely appeals.

**STANDARD OF REVIEW**

¶21 On review of a lower court denial of a motion to suppress evidence in a criminal case, we review supporting findings of fact only for clear error and lower court conclusions and applications of law de novo for correctness. *State v. Olson*, 2002 MT 211, ¶ 7, 311 Mont. 270, 55 P.3d 935; *State v. Carlson*, 2000 MT 320, ¶ 14, 302 Mont. 508, 15 P.3d 893 (citing *State v. Henderson*, 1998 MT 233, ¶ 9, 291 Mont. 77, 966 P.2d 137). Lower court findings of fact are clearly erroneous only if not supported by substantial credible evidence, the court clearly misapprehended the effect of the evidence, or we are firmly and definitely convinced on our review of the record that the court was otherwise mistaken. *State v.*

27

*Pierre*, 2020 MT 160, ¶ 10, 400 Mont. 283, 466 P.3d 494 (citing *State v. Spina*, 1999 MT 113, ¶ 12, 294 Mont. 367, 982 P.2d 421); *State v. Maile*, 2017 MT 154, ¶ 8, 388 Mont. 33, 396 P.3d 1270.

**DISCUSSION**

¶22      *Whether the District Court erroneously denied Zeimer's motion for suppression of evidence discovered upon a vehicle search that resulted from an unlawfully prolonged investigative DUI stop?*

¶23      The Fourth Amendment of the United States Constitution and Article II, Section 11 of the Montana Constitution similarly guarantee people the right to be free from "unreasonable" government "searches and seizures" of their persons, homes, and other areas or things in regard to which they have a reasonable expectation of privacy. U.S. Const. amend. IV;[12] Mont. Const. art. II. § 11; *State v. Staker*, 2021 MT 151, ¶ 10 n.9, 404 Mont. 307, 489 P.3d 489; *State v. Hamilton*, 2003 MT 71, ¶¶ 17-18, 314 Mont. 507, 67 P.3d 871; *Smith v. Maryland*, 442 U.S. 735, 740-41, 99 S. Ct. 2577, 2580 (1979); *Oliver v. United States*, 466 U.S. 170, 176-78, 104 S. Ct. 1735, 1740-41 (1984) (noting implicit right to privacy embodied in the Fourth Amendment and threshold reasonable expectation of privacy test for non-textual area/things first enunciated in *Katz v. United States*, 389 U.S. 347, 360-61, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring)). The fundamental purpose of the federal and state protections against unreasonable searches and seizures is "to protect the privacy and security of individuals from unreasonable government intrusion or

---

[12] The Fourth Amendment applies to the States through the Due Process clause of Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684 (1961).

28

interference." *State v. Hoover*, 2017 MT 236, ¶ 14, 388 Mont. 533, 402 P.3d 1224 (citing *State v. Clayton*, 2002 MT 67, ¶ 11, 309 Mont. 215, 45 P.3d 30, and *United States v. Mendenhall*, 446 U.S. 544, 553-54, 100 S. Ct. 1870, 1877 (1980)—internal punctuation omitted); *Clayton*, ¶ 12 ("central inquiry" under the Fourth Amendment is "reasonableness under all the circumstances of a particular governmental invasion of a citizen's personal security"—citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S. Ct. 1868, 1878-79 (1968)); *Mendenhall*, 446 U.S. at 552-54, 100 S. Ct. at 1876-77 ("purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry"—only "to prevent arbitrary and oppressive interference by [government] officials with the privacy and personal security of individuals").[13]

¶24　As a threshold matter, the Fourth Amendment and Mont. Const. art. II, § 11 right to be from unreasonable government searches and seizures necessarily applies only if and when a government "search" or "seizure" actually occurs.　For purposes of the Fourth Amendment and Mont. Const. art II, § 11, a constitutional "search" is a means of gathering

---

[13] Apart from the implicit privacy protection provided by the Fourth Amendment and similar language of Mont. Const. art. II, § 11, the Montana Constitution separately grants an express right to "individual privacy" against government intrusion.　Mont. Const. art. II, § 10 ("[t]he right of individual privacy is essential to . . . a free society" and "shall not be infringed" absent "showing of a compelling state interest").　In accordance with the special privacy concerns stated by the Framers of our 1972 Constitution, Article II, Section 10 provides broader privacy protection, where implicated, than the Fourth Amendment and similar Article II, Section 11 protections against unreasonable searches and seizures.　*See, e.g., State v. Hardaway*, 2001 MT 252, ¶ 51, 307 Mont. 139, 36 P.3d 900; *State v. Scheetz*, 286 Mont. 41, 47, 950 P.2d 722, 725 (1997); *State v. Solis*, 214 Mont. 310, 316-18, 693 P.2d 518, 521-22 (1984); *State v. Sawyer*, 174 Mont. 512, 515-18, 571 P.2d 1131, 1133-34 (1977), *overruled on other grounds by State v. Long*, 216 Mont. 65, 67-69, 700 P.2d 153, 155-56 (1985).　Zeimer makes no assertion that the broader Mont. Const. art. II, § 10 right to individual privacy is implicated here.

items of evidence or information employed by government agents which substantially infringes or intrudes into or upon one's home, person, or other area or thing in regard to which he or she has a reasonable expectation of privacy. *State v. Elison*, 2000 MT 288, ¶ 48, 302 Mont. 228, 14 P.3d 456 (citation omitted); *State v. Boyer*, 2002 MT 33, ¶¶ 20-47, 308 Mont. 276, 42 P.3d 771 (internal citations omitted); *State v. Scheetz*, 286 Mont. 41, 46, 950 P.2d 722, 724-25 (1997). *See also*, *e.g., State v. Siegal*, 281 Mont. 250, 265, 934 P.2d 176, 184-85 (1997) (overruled in part by *State v. Kuneff*, 1998 MT 287, 291 Mont. 474, 970 P.2d 556); *State v. Carlson*, 198 Mont. 113, 119, 644 P.2d 498, 501 (1982); *Florida v. Jardines*, 569 U.S. 1, 5-6, 133 S. Ct. 1409, 1414 (2013) (internal citations omitted); *Katz*, 389 U.S. at 351, 88 S. Ct. at 511 (Fourth Amendment protects people—not just places). In contrast, a constitutional "seizure" is government action that "deprives [an] individual of dominion over his or her person or property." *State v. Loh*, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996) (quoting *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 2306 (1990)). A person is thus constitutionally "seized" when a government officer restrains his or her liberty "in some way," whether "by means of physical force or show of authority," which under the totality of the circumstances would cause an objectively reasonable belief that the person was "not free to leave" the officer's presence. *Clayton*, ¶ 12 (citing *Terry*, 392 U.S. at 19, 88 S. Ct. at 1879, and *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877; *State v. Roberts*, 1999 MT 59, ¶ 16, 293 Mont. 476, 977 P.2d 974 (citing *Mendenhall*); *Terry*, 392 U.S. at 16, 88 S. Ct. at 1877 (seizure occurs whenever police accost an individual and restrain freedom to walk away). It necessarily follows, however, that a person is not constitutionally "seized" under such circumstances unless physically

restrained or he or she actually submits or remains in response to the officer's words, conduct, or show of authority. *California v. Hodari D.*, 499 U.S. 621, 625-29, 111 S. Ct. 1547,1550-52 (1991). *Accord Clayton*, ¶¶ 13-27 (citing *Hodari D.* and holding that no seizure occurred where police officers merely slowed and stopped behind defendant's vehicle on a public street without blocking his exit, shined a light into the vehicle without activating their emergency lights or siren, and did not "exit their vehicle and approach" him). Even a brief restraint of a person's liberty constitutes a constitutional seizure. *State v. Massey*, 2016 MT 316, ¶ 9, 385 Mont. 460, 385 P.3d 544; *State v. Martinez*, 2003 MT 65, ¶ 20, 314 Mont. 434, 67 P.3d 207; *State v. Kaufman*, 2002 MT 294, ¶ 14, 313 Mont. 1, 59 P.3d 1166; *State v. Reynolds*, 272 Mont. 46, 49, 899 P.2d 540, 542 (1995); *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 694-95 (1981).[14]

¶25 Government searches and seizures are lawful only if constitutionally reasonable. *See* Mont. Const. art. II, § 11; U.S. Const. amend. IV. Searches and seizures are presumptively reasonable under the Fourth Amendment and Mont. Const. art. II, § 11 if conducted in accordance with a judicial warrant properly issued upon a showing of probable cause of illegal activity and particularly describing the person, area, or item to be

---

[14] *See also* § 45-2-101(73), MCA (defining a "stop" as "the temporary detention of a person that results when a peace officer orders the person to remain in the peace officer's presence"). *Compare Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in [some other] public place, by asking . . . if he is willing to answer some questions, . . . putting questions to him if [so] . . ., [and then] offering in evidence . . . his voluntary answers"—"the fact that the officer identifies himself as a police officer, without more, [does not] convert the encounter into a seizure" absent some objectively reasonably circumstantial belief that the person was not free to leave—internal citations omitted).

searched or seized. *Staker*, ¶¶ 8 and 13; *United States v. Banks*, 884 F.3d 998, 1011 (10th Cir. 2018); *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017). *See also* Mont. Const. art. II, § 11 ("No warrant to search any place, or seize any person or thing shall issue . . . without probable cause"); U.S. Const. amend. IV ("no Warrants" for search or seizure "shall issue, but upon probable cause"); *State v. Goetz*, 2008 MT 296, ¶¶ 26-27, 345 Mont. 421, 191 P.3d 489; *State v. Graham*, 2004 MT 385, ¶ 25, 325 Mont. 110, 103 P.3d 1073 (*Graham I*) ("warrant requirement is the mechanism implementing the constitutional protection against" unreasonable searches and seizures); *State v. Sorenson*, 180 Mont. 269, 274, 590 P.2d 136, 140 (1979) (discussing the "high function" of search warrants—quoting *McDonald v. United States*, 335 U.S. 451, 455-56, 69 S. Ct. 191, 193 (1948)), *overruled on other grounds by State v. Loh*, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996)). *See also United States v. Ross*, 456 U.S. 798, 828-29, 102 S. Ct. 2157, 2175 (1982) (White, J., dissenting).[15]

---

[15] Even searches and seizures conducted in accordance with the warrant and probable cause requirements, or a recognized exception thereto, may be constitutionally unreasonable if the manner of execution was unreasonable under the totality of the circumstances. *See State v. Neiss*, 2019 MT 125, ¶¶ 23-26, 396 Mont. 1, 443 P.3d 435 (distinguishing reasonableness and warrant requirements of Mont. Const. art. II, § 11, and recognizing constitutional reasonableness as function of compliance with warrant requirement and the reasonableness of the manner of execution of the search or seizure); *Clayton*, ¶¶ 12 and 26-27 ("central inquiry" regarding legality of a search or seizure under Fourth Amendment and Mont. Const. art. II, § 11 is the reasonableness of the privacy intrusion); *Illinois v. Caballes*, 543 U.S. 405, 407-10, 125 S. Ct. 834, 837-38 (2005) (seizure lawful at inception may yet be unlawful if "manner of execution unreasonably infringes [constitutionally-protected] interests"—citing *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S. Ct. 1652, 1663 (1984)); *United States v. Banks*, 540 U.S. 31, 35-43, 124 S. Ct. 521, 524-29 (2003) (Fourth Amendment "reasonableness" encompasses consideration of both threshold legitimacy and manner of execution of a search or seizure under the totality of the circumstances); *Wilson v. Arkansas*, 514 U.S. 927, 934-36, 115 S. Ct. 1914, 1918-19 (1995) ("method" of otherwise lawful "entry into a dwelling" is a relevant factor, *inter alia*, in assessing the reasonableness of a "seizure"); *Terry*, 392 U.S. at 17-20 and 28, 88 S. Ct. at 1878-79 and 1883

¶26 In contrast, however, warrantless searches and seizures are constitutionally unreasonable *per se*, except when conducted in strict accordance with certain recognized and narrowly limited exceptions to the warrant requirement. *State v. Ballinger*, 2016 MT 30, ¶ 16, 382 Mont. 193, 366 P.3d 668; *State v. Hardaway*, 2001 MT 252, ¶ 36, 307 Mont. 139, 36 P.3d 900; *Elison*, ¶ 39 (citing *Loh*, 275 Mont. at 468, 914 P.2d at 597); *State v. Hubbel*, 286 Mont. 200, 212, 951 P.2d 971, 978 (1997); *Horton*, 496 U.S. at 133-34, 110 S. Ct. at 2306; *Katz*, 389 U.S. at 357, 88 S. Ct. at 514. Because they are constitutionally unreasonable *per se*, the State has the burden of demonstrating that a challenged warrantless search or seizure falls within one of the narrow range of recognized exceptions to the warrant requirement of the Fourth Amendment or Mont. Const. art. II, §§ 10-11. *Goetz*, ¶ 40 (citing *Sorenson*, 180 Mont. at 273, 590 P.2d at 139).

*Terry* Investigative Stop Exception to Probable Cause & Warrant Requirements.

¶27 First recognized by the United States Supreme Court in *Terry*, 392 U.S. at 16, 88 S. Ct. at 1877, and further developed in *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 694-95, one recognized and narrowly limited exception to the warrant and probable cause requirements is the temporary investigative stop, also known as a *Terry* stop. Under this exception, a law enforcement officer may briefly stop and detain a person for investigative purposes without a warrant or probable cause for an arrest if, based on *specific and articulable facts known to the officer* and rational law enforcement inferences, the officer

---

("[t]he manner in which the [warrantless] seizure and search were conducted is, of course, as vital a part of the [reasonableness] inquiry as whether they were warranted at all").

33

has an objectively reasonable particularized suspicion that the person is engaged, or about to engage, in criminal activity. *Elison*, ¶ 15; *Roberts*, ¶ 12; *Reynolds*, 272 Mont. at 49-50, 899 P.2d at 542; *State v. Gopher*, 193 Mont. 189, 193-94, 631 P.2d 293, 295-96 (1981) (recognizing and applying *Cortez* formulation of *Terry* stop standards); *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 694-95; *Terry*, 392 U.S. at 19-22, 88 S. Ct. at 1879-80. In other words, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity"—"officers must have a particularized and objective basis" under the "totality of the circumstances" for "suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 694-95 (internal citations omitted).[16] Relevant factual considerations include the quantity, substance, quality, and degree of reliability of information known to officer. *State v. Pratt*, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997); *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990). "[T]his demand for *specificity* in the information upon which police action is predicated" is *the essential justification* underlying the *Terry* investigative stop exception to Fourth Amendment warrant and probable cause requirements. *Cortez*, 449 U.S. at 418, 101 S. Ct. at 695 (quoting *Terry*, 392 U.S. at 21 n.18, 88 S. Ct. at 1880—emphasis original).

---

[16] The *Terry* investigative stop exception, as further developed in *Cortez*, is codified in Montana at §§ 46-5-401 and -403, MCA (authorizing temporary stop of a person "to obtain an account of the person's presence or conduct or to determine whether to arrest the person" upon observing the person "in circumstances that create a particularized suspicion that the person . . . has committed, is committing, or is about to commit an offense"). *See State v. Bar-Jonah*, 2004 MT 344, ¶ 42, 324 Mont. 278, 102 P.3d 1229 (noting Montana codification of constitutional principles); Comments of Commission on Criminal Procedure §§ 20.01-20.03 (Jan. 10, 1989), File No. 88-559, in the collection of the Clerk of the Montana Supreme Court (hereinafter Commission Comments).

¶28 The *Terry* particularized suspicion standard does not require that an officer be certain, or even ultimately correct, that a person is engaged or about to be engaged in criminal activity. *See State v. Thomas*, 2008 MT 206, ¶ 10, 344 Mont. 150, 186 P.3d 864; *Henderson*, ¶ 12; *Gopher*, 193 Mont. at 192, 631 P.2d at 295; *Cortez*, 449 U.S. at 418, 101 S. Ct. at 695. It does not depend on "hard certainties," but on "probabilities" based on "commonsense conclusions" from the perspective of "those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418, 101 S. Ct. at 695.[17] However, a reasonable particularized suspicion requires more than mere generalized suspicion, possibility, an undeveloped hunch, or good faith belief. *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S. Ct. 673, 676 (2000); *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883. *See also State v. Strom*, 2014 MT 234, ¶¶ 4-5, 14-17, 376 Mont. 277, 333 P.3d 218 (daytime observation of occupied vehicle legally parked alone in public-use area near oft-vandalized war memorial insufficient for particularized suspicion of criminal activity); *State v. Jarman*, 1998 MT 277, ¶¶ 14-15, 291 Mont. 391, 967 P.2d 1099 (mere presence in phone booth in high crime area on cold night insufficient particularized suspicion of criminal activity); *Reynolds*, 272 Mont. at 49-51, 899 P.2d at 542-43 (mere suspicion of "possible" traffic violation "combined with no other objective data" insufficient to justify investigatory stop); *Brown v. Texas*, 443 U.S. 47, 50-53, 99 S. Ct. 2637, 2640-41 (1979) (generalized observation that

---

[17] *See also Illinois v. Wardlow*, 528 U.S. 119, 124-25, 120 S. Ct. 673, 676 (2000) (noting that "empirical studies dealing with inferences drawn from suspicious behavior" are not available and that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior"—citing *Cortez*).

person looked suspicious in "neighborhood frequented by drug users" insufficient to justify investigative stop). The assessment of whether an officer had a reasonable particularized suspicion of criminal activity sufficient to justify making or continuing a temporary investigative stop depends on the facts and circumstances *known to the officer at the time* of the stop and any continuation. *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020) (reasonable particularized suspicion of criminal activity depends upon "what the officer reasonably knew at the time" rather than in "hindsight"—internal punctuation and citations omitted); *Leverette v. Bell*, 247 F.3d 160, 168 n.5 (4th Cir. 2001) (reasonable suspicion must evaluated based on what the officer knew "at the time"—not in "hindsight"); *Lindsey v. Storey*, 936 F.2d 554, 559-60 (11th Cir. 1991) (noting that facts then unknown to officer are immaterial to whether he or she had a reasonable particularized suspicion of criminal activity at the time of the stop).

¶29    Moreover, because the *Terry* investigative stop exception authorizes no more than a reasonably brief and minimally intrusive interference with the individual liberty and privacy of the subject, law enforcement officers must act with reasonable diligence to quickly confirm or dispel the underlying particularized suspicion that justified the initial stop and any continuation. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985) (whether an officer unreasonably continued or expanded the duration of an initially lawful investigative stop depends on whether the officer "diligently pursued a means of investigation . . . likely to confirm or dispel" the particularized suspicion justifying the stop); *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26 (1983) (*Terry* stop exception warrants only a "limited intrusion on the personal security of the

36

subject" and the officer must "employ[] . . . the least intrusive means reasonably available to verify or dispel" the predicate particularized suspicion "in a short period of time"). The authorized scope and duration of an investigative stop thus may not exceed that reasonably necessary to confirm or dispel the particularized suspicion of criminal activity that justified the initial stop or its continuation. *Martinez*, ¶ 27 ("an investigative stop is a temporary detention that may not last longer than is necessary to effectuate the purpose of the stop"— citing *Terry*, 392 U.S. at 29, 88 S. Ct. at 1883-84, and § 46-5-403, MCA); *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26 (duration and scope of an investigative stop must be carefully limited to its "underlying justification" and the "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose [that justified] the stop"); *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79 (scope and duration of the stop "must be strictly tied to and justified by the circumstances which rendered its initiation permissible," *i.e.*, "reasonably related in scope to the circumstances which justified the interference in the first place"—internal punctuation and citations omitted).[18]  However, judicial assessment of the reasonableness of the duration and scope of an investigative stop must recognize that the State's compelling interest in "effective law enforcement" demands that officers in the field have reasonable "latitude" to reach, follow up on, and confirm or dispel initial suspicions of criminal activity. *State v. Sharp*, 217 Mont. 40, 47, 702 P.2d 959, 963

---

[18] This corollary to the investigative stop exception is codified in Montana at § 46-5-403, MCA (temporary investigative stop "may not last longer than is necessary to effectuate the purpose of the stop"). *See also Carlson*, ¶ 21 (citing § 46-5-403, MCA, and *Royer*); Commission Comments, *supra*, § 20.03.

(1985); *see also State v. Seaman*, 2005 MT 307, ¶ 29, 329 Mont. 429, 124 P.3d 1137 (citing *Sharp* in community caretaker context). In that regard, questioning related to the justification for the stop "is an essential part" of temporary investigative stops. *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185-86, 124 S. Ct. 2451, 2458 (2004) (noting that questions concerning the subject's identity are reasonably-related to the purpose of an investigative stop). *See also* § 46-5-401(2)(a), MCA (upon investigative stop officer may request a person's name, current address, and "an explanation" of the person's conduct in relation to the officer's particularized suspicion for the stop); *Hayes v. Florida*, 470 U.S. 811, 816, 105 S. Ct. 1643, 1647 (1985) (person may be stopped upon particularized suspicion of criminal activity for identification and to obtain "additional [related] information"); *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 681 (1985) ("the ability to briefly stop" a person on particularized suspicion of illegal activity to "ask questions" or "check [his or her] identification . . . promotes the strong government interest in solving crimes and bringing offenders to justice"). The "key principle of [constitutional] reasonableness" is "the balancing of competing interests" in individual liberty and privacy with government's compelling government interest in law enforcement. *Michigan v. Summers*, 452 U.S. 692, 770 n.12, 101 S. Ct. 2587, 2593 (1981) (discussing various permissible "investigative techniques which may be [used] effectively in the course of a *Terry*-type stop" including request for identification and questioning regarding the particularized suspicion that justified the stop).

¶30     As a corollary to the investigative stop exception, the officer may lawfully expand or prolong the scope or duration of an investigative stop beyond its initial justification upon

38

development of a new or expanded particularized suspicion of criminal activity based on additional specific and articulable facts observed or discovered during the lawful scope and duration of the initial stop. *State v. Case*, 2007 MT 161, ¶ 34, 338 Mont. 87, 162 P.3d 849; *Carlson*, ¶ 21; *Hulse v. Mont. Dep't of Justice Motor Veh. Div.*, 1998 MT 108, ¶¶ 40-42, 289 Mont. 1, 961 P.2d 75; *Sharp*, 217 Mont. at 46, 702 P.2d at 963. *See also State v. Laster*, 2021 MT 269, ¶ 14, 406 Mont. 60, 497 P.3d 224 ("investigative stop cannot permissibly ripen into new or broader particularized suspicion of criminal activity unless sufficient particularized suspicion of criminal activity existed at the start and continues to exist prior to the development of the additional information on which an officer relies to expand its duration or scope"—internal citations omitted); *Hoover*, ¶ 23 (citing *Hulse*, ¶¶ 40-42, and § 46-5-403, MCA); *State v. Morsette*, 201 Mont. 233, 242, 654 P.2d 503, 508 (1982) (a stop "lawful at the outset can become unlawful if it becomes overly intrusive"—citing *Kremen v. United States*, 353 U.S. 346, 77 S. Ct. 828 (1957)); *Terry*, 392 U.S. at 17-18, 88 S. Ct. at 1878 (a stop constitutionally "reasonable at its inception may" become unconstitutional "by virtue of its [unreasonable] intensity and scope"). Like the limited lawful scope and duration of the initial stop, any new or expanded investigation is then similarly limited in lawful scope and duration to the new or expanded particularized suspicion that justified it. *Hulse*, ¶ 40 (on lawful stop the "officer's suspicions may become further aroused" justifying a corresponding expansion of the initial scope or duration of the stop "*provided* the scope of the investigation remains within the limits created by the facts upon which the stop is predicated and the suspicion which they [subsequently] arouse"— emphasis added and internal punctuation and citation omitted). *See also Martinez*,

¶¶ 27-29; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at 19-20, 88 S. Ct. at 1878-79.

¶31 At the point that the investigating officer has either dispelled the predicate particularized suspicion that justified the initial stop within its lawful scope and duration, or failed to observe or discover additional specific and articulable facts justifying expansion of the scope or duration of the stop based on a new or expanded particularized suspicion of criminal activity, the stop must end without further delay. *See, e.g.*, *State v. Harning*, 2022 MT 61, ¶¶ 28-29, 408 Mont. 140, __ P.3d __ (holding that justice court erroneously failed to suppress subsequently discovered drug evidence where the investigating state trooper failed to articulate objective data sufficient to support a new or expanded particularized suspicion of illegal drug possession justifying extension of the traffic stop after addressing the initial speeding predicate and determining that the driver was not impaired in relation to a detected marijuana odor and his admission that he earlier smoked marijuana in another location); *State v. Wilson*, 2018 MT 268, ¶¶ 36-37, 393 Mont. 238, 430 P.3d 77 (holding that traffic stop should have ended upon issuance of subject traffic citations where officer "lacked the requisite particularized suspicion to extend the stop into a drug investigation"); *Hoover*, ¶¶ 2-6, 19-23, 28, and 30 (holding that justice court erroneously failed to suppress probation violation and DUI evidence discovered upon investigative stop of vehicle and occupants lawfully parked around midnight in secluded area on private commercial property where officer articulated no more than generalized suspicion or hunch of possible theft and/or involuntary sexual conduct); *State v. Driscoll*, 2013 MT 63, ¶¶ 5-8, 14, and 15, 369 Mont. 270, 303 P.3d 788 (upholding suppression of

40

underage drinking evidence discovered after officers removed and cited a youthful-appearing man holding a beer in a bar without identification where they were unable to articulate any additional facts other than that he was "acting defensively" to support their continued suspicion that he was not 22 years-old as asserted ); *State v. Graham* (*Graham II*), 2007 MT 358, ¶¶ 2-4, 16-20, 340 Mont. 366, 175 P.3d 885 (holding that trial court erroneously failed to suppress DUI evidence discovered upon investigative stop of vehicle and occupants lawfully parked on county road kissing in broad daylight with female attempting "to mount" male companion where investigating officer had no more than generalized suspicion or hunch of possible mechanical problems, indecent exposure, or illegal sexual conduct); *Martinez*, ¶¶ 29, 62, and 74 (once the "limited purpose of the stop [has] been accomplished, no further police intrusion [is] warranted" and the stop must terminate absent new or additional particularized suspicion justifying further investigation—holding that district court erroneously failed to suppress drug evidence discovered upon continuation of a traffic stop after the initial justification for the stop (suspected invalid temporary registration sticker) was dispelled after officer stopped and approached the subject's car on foot without need for interaction with the driver); *Kaufman*, ¶¶ 7-8, 16-19, and 23-25 (holding that district court erroneously failed to suppress drug evidence discovered upon traffic stop because the initial legal justification for the stop (suspected malfunctioning tail lights) disappeared upon activation of emergency lights and approach of suspect vehicle prior to the actual stop); *Carlson*, ¶ 21 (affirming that "officers detained Carlson for longer than was necessary to effectuate the initial purpose of the stop, thereby transforming an otherwise lawful investigatory stop into a constitutionally

41

deficient seizure"); *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006) ("once the purpose of the stop is satisfied and any underlying reasonable suspicion dispelled" the "detention generally must end without undue delay"); *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003) ("[o]nce the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional [particularized] suspicion [of criminal activity] supported by articulable facts"). *See also* § 46-5-403, MCA; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at 19-20, 88 S. Ct. at 1878-79. *Compare City of Missoula v. Kroschel*, 2018 MT 142, ¶¶ 12 and 18-20, 391 Mont. 457, 419 P.3d 1208 (factually distinguishing *Driscoll* and holding that officer articulated specific facts supporting continued particularized suspicion of underage drinking to prolong an investigative stop for further investigation despite fact that database checks were unable to confirm their suspicion). It thus follows that any incriminating evidence discovered as a result of an unlawful investigatory stop, or beyond the lawful scope and duration of a valid investigatory stop, is irrelevant and immaterial to whether the officer had sufficient particularized suspicion of criminal activity to justify the antecedent stop or expansion of stop that resulted in the discovery. *Harning*, ¶ 24 (noting the temptation "to forgive an officer's illegal extension of a stop" however minimal, when it leads to discovery of evidence of illegality but that such temptation "belies the basic principle at the heart of search and seizure jurisprudence" that "[t]wo wrongs do not make a right"—citing *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341 (1914)). *See also Wilson*, ¶¶ 36-37; *Hoover*, ¶¶ 28 and 30; *Driscoll*, ¶ 15; *Graham II*, ¶¶ 16-20; *Martinez*, ¶¶ 62 and 74; *Kaufman*, ¶¶

42

16-19 and 23-25; *Carlson*, ¶ 21; *State v. Ribera*, 183 Mont. 1, 6, 597 P.2d 1164, 1167 (1979) (if constitutional justification for the seizure or search of a person was lacking "no evidence discovered as a result of a search of defendant can be used to justify the [antecedent seizure or search]"—internal citation omitted).

¶32 The question of whether an officer had a particularized suspicion of criminal activity, based on knowledge of specific and articulable objective facts and reasonable law enforcement inferences, is first a question of fact under the totality of the circumstances subject to review only for clear error. *Hoover*, ¶ 17 (internal citations omitted); *Kaufman*, ¶¶ 10-12; *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 695; *Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880. However, any related conclusion or application of law, such as whether the involved or indicated activity was unlawful in nature or whether the asserted particularized suspicion was objectively reasonable, is a question of law subject to de novo review. *Kaufman*, ¶¶ 10-11 (assessment of whether an officer had a reasonable particularized suspicion of criminal activity "may [also] encompass legal conclusions, such as whether or not a particular act or omission violates the law" and "[a]lso[] the legal standard of objective reasonableness"—citing *State v. Lafferty*, 1998 MT 247, ¶ 10, 291 Mont. 157, 967 P.2d 363, *abrogated on other grounds by State v. Flynn*, 2011 MT 48, ¶¶ 10-12, 359 Mont. 376, 251 P.3d 143, and *Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657 (1996)); *Lafferty*, ¶ 10 (whether "particularized suspicion exists to justify an investigative stop is a question of fact which depends on the totality of the circumstances" but such determination may also "include conclusions [and applications] of law" reviewed de novo for correctness); *Ornelas*, 517 U.S. at 694-99, 116 S. Ct. at 1660-63 (assessment of an

asserted "reasonable [particularized] suspicion and probable cause" involve mixed questions of fact and law subject to *de novo* review except that "findings of historical fact" are subject to review "only for clear error"). Because warrantless searches and seizures are *per se* unreasonable, the State has the burden of showing that a challenged warrantless investigative stop was based on an actual and objectively reasonable particularized suspicion that the subject was engaged or about to engage in criminal activity based on actual knowledge of specific and articulable facts and resulting inferences. *State v. Waite*, 2006 MT 216, ¶ 11, 333 Mont. 365, 143 P.3d 116; *Elison*, ¶ 15; *State v. Angeline*, 1998 MT 139, ¶ 22, 289 Mont. 222, 961 P.2d 1251; *Gopher*, 193 Mont. at 194, 631 P.2d at 296.

Initial Investigatory Stop of Zeimer

¶33 Based on the initial 911 report, Deputy 1's initial observations of a vehicle irregularly parked across the parking stripes outside the rear casino/store door at the truck stop with a man slumped over the steering wheel, Zeimer acknowledges, and we agree, that Deputy 1 initially had sufficient particularized suspicion justifying a CCD stop of Zeimer for the purpose of checking on his welfare.[19] However, a CCD stop must "actually

---

[19] The CCD is a doctrinal analogue to the *Terry*-stop exception to the Fourth Amendment and Article II, Section 11 probable cause and warrant requirements. *See Laster*, ¶¶ 15-17 (*inter alia* citing *State v. Nelson*, 2004 MT 13, ¶ 6, 319 Mont. 250, 84 P.3d 25 (noting general duty of police to "investigate uncertain situations in order to ensure the public safety" apart from the enforcement of the criminal law); *State v. Lovegren*, 2002 MT 153, ¶ 20, 310 Mont. 358, 51 P.3d 471 (recognizing police duty "to investigate situations in which a citizen may be in peril or need some type of assistance from an officer")). In contrast to the criminal investigatory purpose underlying the *Terry* investigative stop exception, the CCD narrowly applies only to "certain police-citizen encounters" where police become involved, "unrelated to" the enforcement or prosecution of the criminal law, to check-on or aid persons who may be "in peril" or otherwise in need of some form of assistance. *Laster*, ¶ 15 (citing *State v. Marcial*, 2013 MT 242, ¶¶ 13 and 15, 371 Mont. 348, 308 P.3d 69 and *State v. Spaulding*, 2011 MT 204, ¶¶ 18-19, 361 Mont. 445, 259 P.3d 793 (CCD applies when police initiate contact to "ensure the safety" or welfare of a citizen—"not to

44

involve a welfare check" and may not "be used as a pretext for an illegal search and seizure." *State v. Spaulding*, 2011 MT 204, ¶ 24, 361 Mont. 445, 259 P.3d 793. *See also State v. Reiner*, 2003 MT 243, ¶¶ 20-22, 317 Mont. 304, 77 P.3d 210 (rejecting State's alternative characterization of a stop resulting in a DUI conviction as a CCD stop where the officer testified that he approached a vehicle parked on side of highway in response to DUI report rather than as a welfare check). Moreover, "[s]imilar to the limited permissible scope and duration of a *Terry* stop," once the objective facts and circumstances manifest that the subject is not or no longer in peril, distress, or otherwise in need of assistance, "the original constitutional justification for a CCD stop ends unless some other constitutional justification" exists or arises for completing or prolonging the stop. *Laster*, ¶ 18 (citing *Spaulding*, ¶ 21—internal punctuation omitted). Here, Deputy 1 acknowledged at hearing that his initial justification for a welfare check stop evaporated and was thus dispelled at the point that he saw Zeimer perk-up, check his mirrors, put the truck in gear, and lawfully drive away without any apparent indicia of peril, distress, or need for assistance.

---

investigate the commission of a crime"). *See similarly Lovegren*, ¶ 17 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973) (noting Fourth Amendment justification for CCD based on government interest in public safety/welfare-based police investigations "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of [the] criminal" law)). Under the CCD, a police officer may accordingly, for the limited purpose of checking on the person's welfare and either "mitigat[ing] the peril" or providing other needed assistance "in furtherance of the person's safety or welfare," effect a temporary constitutional seizure of the person if the officer has "an objectively reasonable particularized suspicion" that he or she "may presently be in peril or otherwise in need of assistance" "based on *specific and articulable facts known to the officer* and [any] resulting rational inferences" therefrom. *Laster*, ¶ 17 (citing *Spaulding*, ¶¶ 18 and 21, and *Lovegren*, ¶¶ 24-25 (emphasis original)).

45

¶34 Tacitly conceding that point, the State asserts that the same factual observations that initially justified a CCD welfare check stop (truck parked perpendicularly across several lined parking spaces with driver slumped over the wheel apparently sleeping or passed out), coupled with his additional articulated observations of Zeimer "driving away" in an "abnormally" slow manner with "abnormally" wide turns around to the front of the store, gave Deputy 1 a reasonable particularized suspicion that Zeimer may be DUI.[20] The deputy acknowledged at the suppression hearing that Zeimer's irregular parking and apparent sleeping behind the wheel in the truck stop parking lot were not illegal. Nor were his abnormally slow driving or wide turns around the truck stop store/casino. The State correctly notes, however, that we have long recognized that erratic or abnormal driving that is not technically illegal may nonetheless be sufficient, in conjunction with other articulated circumstances and law enforcement inferences, to give rise to a reasonable particularized suspicion of DUI under the totality of the circumstances in a particular case. *See, e.g., State v. Schulke*, 2005 MT 77, ¶¶ 17-18, 326 Mont. 390, 109 P.3d 744 (particularized suspicion of DUI does not require observation or recognition of a "particular statutory violation and/or cite a defendant for a moving violation to establish a

---

[20] Despite ambiguous language in the District Court's written ruling seemingly suggesting that the initial police encounter with Zeimer was merely a permissible police-citizen encounter not rising to the level of a constitutional seizure, *see Royer*, 460 U.S. at 497, 103 S. Ct. at 1324 (noting that police officers do not effect a constitutional seizure of a person "by merely approaching an individual on the street or in another public place," "asking him if he is willing to answer some questions," and then "putting questions to him if the person is willing to listen"), the State tacitly acknowledges, as it conceded below, that Deputy 1's initial encounter with Zeimer was a constitutional seizure through its assertion that it was a lawful investigative stop based on the deputy's articulated particularized suspicion of DUI.

particularized suspicion"); *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735 (holding that erratic and abnormal driving behavior—conspicuous attempt to avoid approaching patrol car, driving away in abnormally slow manner (7-10 mph in a 25 mph speed zone), and "meandering" back and forth between the side and center of the road and across the center of the road—was sufficient to support a particularized suspicion of DUI under the totality of the circumstances); *Hulse*, ¶ 39 (noting that erratic driving, such as "driving all over the road, crossing the center line and the fog line, weaving in and out of traffic, or braking for green lights," may support a particularized suspicion of DUI under the totality of the circumstances).

¶35    Here, at the suppression hearing, the deputy articulated a number of particular observations prior to stopping and engaging Zeimer, none of which constituted or were necessarily indicative of illegal conduct. However, based on his law enforcement training and experience, he further articulated and reasonably inferred that those particularized observations indicated in the aggregate that the driver of the truck may have been under the influence of alcohol or drugs rather than merely engaged in some other innocuous activity. We accordingly hold that the District Court correctly concluded that Deputy 1's initial stop of Zeimer after he parked in front of the truck stop store was a lawful investigatory stop based on an objectively reasonable particularized suspicion of DUI under the totality of the circumstances and inferences articulated by the deputy at hearing.

¶36    However, under the constitutional *Terry* stop analysis, a related issue remains as to whether and at what point, if any, the scope or duration of the stop thereafter unlawfully exceeded that reasonably necessary to dispel or exhaust the original justification and

47

purpose of the stop with reasonable diligence before one of the deputies asked Zeimer for consent to search his truck for contraband unrelated to whether he was in fact actually impaired. As a preliminary matter, the standardized field sobriety tests typically conducted by Montana law enforcement officers (i.e., the nine-step walk-and-turn, one-leg stand, HGN, and statutorily-authorized PBT/PASTs) upon investigative DUI stops are each, in and of themselves, additional and more intrusive infringements and interferences with a person's individual liberty and privacy rights than the underlying constitutional seizure (i.e. stop) of the person. *Bramble v. Mont. Dep't of Justice Motor Vehicle Div.*, 1999 MT 132, ¶ 23, 294 Mont. 501, 982 P.2d 464 (citing *Hulse*); *Hulse*, ¶¶ 11-12, 19, and 32-33. Those standardized field sobriety and PBT/PAST tests thus effect separate constitutional searches, distinct from underlying DUI stop/seizure of the person and related investigatory questioning, and are thus not lawful unless supported by an objectively reasonable particularized suspicion of DUI, based on specific and articulated facts and circumstances known to the investigating officer under the totality of the circumstances, whether known to the officer prior to the initial stop or discovered thereafter within its lawful scope and duration. *State v. Zimmerman*, 2018 MT 94, ¶ 16, 391 Mont. 210, 417 P.3d 289 (the "particularized suspicion necessary to justify an initial investigatory stop may, but does not automatically, extend to the particularized suspicion required for an alternative investigation into another offense" and thus an officer "must have a [distinct] particularized suspicion of [DUI]" or other DUI-related offense "before [he or she] may investigate DUI after a traffic stop and administer field sobriety tests or breath tests"—citing *Hulse*, ¶¶ 39-42 and statutory authorization for PBT/PASTs); *Bramble*, ¶¶ 23 and 29 (citing *Hulse*

48

and noting that lack of sufficient particularized suspicion of DUI for field sobriety tests similarly constitutes lack of particularized suspicion for PBT/PAST); *Hulse*, ¶¶ 19, 32-35, and 38-40. As particularly applicable to investigative DUI stops, the *Terry* particularized suspicion requirement necessarily requires a reasonable particularized suspicion that, due to alcohol or drug intake, the person's "ability to safely operate a vehicle has been diminished." *See* §§ 61-8-401(1)(a) and (3), MCA (referencing and defining "under the influence" as an included element of DUI—repealed and superseded by 2021 Mont. Laws ch. 498). *See also, e.g., Henderson*, ¶¶ 15 & 19; *Hulse*, ¶¶ 39-40; *Reynolds*, 272 Mont. at 50-51, 899 P.2d at 543. Here, the State asserts that the initial particularized suspicion of DUI that justified the initial investigatory stop of Zeimer was also similarly sufficient to "permit[] the deputies to . . . conduct field sobriety tests to ensure that Zeimer was not [DUI]."

¶37 We would agree, if that was indeed what the deputies proceeded to do with reasonable diligence, but they did not. After his initial post-stop DUI-related questioning, Deputy 1 did not diligently proceed with field sobriety testing to either confirm or dispel his initial particularized suspicion of DUI. After his initial post-stop observations and questioning revealed no apparent confirmatory indica of actual impairment, the deputies transitioned to extensive and prolonged questioning of Zeimer's odd, inconsistent, and seemingly deceptive account of his presence and prior activities. As manifest by his unrelated non-sequitur questioning about Zeimer's prior association with a "Rob Hammonds," acknowledged prior knowledge of Zeimer's involvement in some other unspecified case "three months" earlier, taking time to call Zeimer's sister and question

49

her to verify Zeimer's account of his presence at the truck stop, then taking time to confront him with his sister's contradictory statements, and repeated challenges of Zeimer for a more truthful account of his presence, the deputy was conducting an investigation of something other than whether Zeimer was actually impaired due to alcohol or drug use.

¶38   After this initial round of non-DUI-related questioning dead-ended, the deputy then subjected Zeimer to a protective pat-down/frisk search for the purported purpose of ensuring the deputy's safety. Under the particular record circumstances of this case, the frisk/pat-down search was and is peculiarly significant to whether or not he was attempting to confirm or dispel his initial particularized DUI suspicion with reasonable diligence, or whether he was conducting some other unrelated investigation. As a preliminary matter, similar to standardized field sobriety tests, officer-safety protective pat-down/frisks involve an additional degree of intrusion and interference with the subject's protected personal privacy interest beyond that involved in the underlying investigative seizure of the person and related questioning. Consequently, warrantless protective pat-down/frisks not incident to arrest are thus distinct constitutional searches, lawful only upon a distinct, reasonable particularized suspicion, based on specific and articulable objective facts and resulting inferences under the totality of the circumstances, that the subject is "*armed and presently dangerous.*" *Terry*, 392 U.S. at 27 and 30-31, 88 S. Ct. at 1883-85 (emphasis added). *See also Laster*, ¶¶ 19-20 (analyzing *Terry* protective frisk/pat-down search exception to Fourth Amendment and Mont. Const. art. II. § 11 warrant and probable cause

50

requirements).[21] The separate *Terry* protective pat-down/frisk search exception incident to a lawful investigative stop thus requires more than a mere generalized suspicion or possibility, undeveloped hunch, or good faith belief that the subject may be armed and presently dangerous. *See Terry*, 392 U.S. at 22 and 27, 88 S. Ct. at 1880 and 1883. Here, nothing in the evidentiary record evinces that the deputy in fact had even a subjective suspicion that Zeimer was presently armed and dangerous, much less an objectively reasonable particularized suspicion based on specific and articulated facts and inferences. His stated intent and conduct of the pat-down search occurred non-sequitur over ten minutes into the course of the stop, and then only after his non-DUI-related questioning regarding Zeimer's account of his presence and preceding activities dead-ended. While it is certainly conceivable, and not uncommon, that an officer may not become aware of facts sufficient to support a particularized suspicion that a person is presently armed and dangerous until well into the progression of a valid investigatory stop, the deputy's stated purpose for the pat-down search was particularly dubious and belied by the evidentiary record here.

¶39    Even when justified based on a particularized suspicion that the subject is presently armed and dangerous, the constitutionally-authorized manner and scope of a protective frisk/pat-down search is narrowly limited to a protective pat-down of the subject's "outer

---

[21] The *Terry* protective frisk/pat-down search is codified in Montana at § 46-5-401(2)(b), MCA (1991 Mont. Laws ch. 800, § 43—formerly § 46-5-402, MCA (1989)). *Bar-Jonah*, ¶ 42; *State v. Collard*, 286 Mont. 185, 193-94, 951 P.2d 56, 62 (1997); Commission Comments, *supra*, §§ 20.01-20.03. *See also State v. Graves*, 191 Mont. 81, 87, 622 P.2d 203, 206-07 (1981).

clothing," without more intrusive tactile manipulation, for items readily recognizable as weapons. *Terry*, 392 U.S. at 27, and 30-31, 88 S. Ct. at 1883-85. *See also State v. Stubbs*, 270 Mont. 364, 369-73, 892 P.2d 547, 550-53 (1995) (upholding seizure of small brass drug pipe perceived by officer on *Terry* pat-down as a potential knife or derringer), *overruled on other grounds by Loh*, 275 Mont. at 471-73, 914 P.2d at 599-600. Only on ready-recognition of an item felt on a valid pat-down of a subject's outer clothing may the officer seize, examine, and temporarily hold the discovered weapon as necessary to provide for the safety of the officer and any others nearby during the lawful duration of the underlying investigative stop. *Laster*, ¶¶ 19-20 (citing *Terry*); *Terry*, 392 U.S. at 30-31, 88 S. Ct. at 1884-85.[22] In any event, the limited *Terry* protective pat-down/frisk search exception does not permit "random[] 'recover[y]' [of] items from the suspect's clothing" for examination absent ready-recognition of them as a weapon on pat-down touch. *State v. Heath*, 2000 MT 94, ¶ 17, 299 Mont. 230, 999 P.2d 324 (*Terry* protective pat-down/frisk exception does not allow police "to simply 'recover' objects from the suspect's clothing" for examination "and then, after the fact, argue that the objects *might have* contained a weapon or were immediately apparent as contraband"). Because the "[t]he sole justification" and purpose of a *Terry* pat-down search is "protection of the police officer and others nearby," *Terry*, 392 U.S. at 26 and 29, 88 S. Ct. at 1882 and 1884, the protective

---

[22] *See also* § 46-5-401(2)(b), MCA ("[t]he officer may take possession of any object that is discovered during the course of the frisk if the officer has probable cause to believe that the object is a deadly weapon until the completion of the stop, at which time the officer shall either immediately return the object, if legally possessed, or arrest the person").

pat-down/frisk exception further does not in any event justify warrantless pat-down searches and seizures for other evidence or contraband. *Terry*, 392 U.S. at 29, 88 S. Ct. at 1884. *Accord Laster*, ¶ 20 (construing *Terry*). The protective *Terry* frisk "must therefore be confined in scope" to a limited pat-down of the subject's outer clothing "reasonably designed to discover guns, knives, clubs, or other hidden instruments" readily recognizable as weapons. *See Terry*, 392 U.S. at 29, 88 S. Ct. at 1884. *Accord Laster*, ¶ 20 (construing *Terry*).[23]

¶40 While the lawfulness of Deputy 1's purported *Terry* protective pat-down/frisk search of Zeimer is not directly at issue here, it is beyond genuine material dispute on the evidentiary record that, even if presumed *arguendo* to have been lawfully based on a particularized suspicion that Zeimer was presently armed and dangerous, the deputy's diving reaches into and retrieval of various objects from Zeimer's pants and coat pockets far exceeded the permissible scope of a *Terry* protective pat-down search without any officer-articulated basis upon which to reasonably suspect that any of those items were readily recognizable as weapons. The manifest lack of factual justification for the purported protective pat-down search, coupled with its excessive manner and scope, belied

---

[23] As a limited exception to the general rule, an officer may seize contraband upon a valid protective pat-down search if, in the course of conducting a limited pat-down of the subject's outer-clothing, the officer "feels an object" which, based on its "contour or mass" without further tactile manipulation, is "immediately apparent" as contraband. *Minnesota v. Dickerson*, 508 U.S. 366, 374-75 and 379, 113 S. Ct. 2130, 2136-37 and 2139 (1993) (recognizing "plain feel" exception corollary to plain-view exception). *See also Collard*, 286 Mont. at 193-94, 951 P.2d at 61-62 (applying "plain feel" exception); *Stubbs*, 270 Mont. at 369-73, 892 P.2d at 550-53 (upholding seizure of small brass drug pipe as a potential knife or derringer—distinguishing *Dickerson* based on particularized officer belief that subject item was a weapon rather than contraband).

the stated officer-safety purpose of the pat-down search, thus exposing the stated purpose as an unsupported pretext for invasively searching Zeimer's pockets for the presence of illegal drugs or other contraband. It is further difficult, if not impossible, to reasonably conceive that, aside from the manifest lack of constitutional justification for the pat-down search and related pocket-dives and retrieval, any item that could conceivably have been found in Zeimer's pockets could possibly have aided in confirming or dispelling whether he was in fact *impaired* by alcohol or drug use within the lawful scope of the limited DUI investigation that justified the underlying stop. Thus, under the particular circumstances of this case, the pat-down search clearly manifests that Deputy 1 was not proceeding with reasonable diligence to confirm or dispel the articulated initial suspicion that justified the stop, i.e., whether Zeimer was in fact actually impaired while operating a motor vehicle.

¶41 Upon completion of the purported protective pat-down search, Deputy 1 resumed grilling Zeimer about his inconsistent account of his overnight presence at the truck stop. Deputy 2 then joined the continuing questioning about Zeimer's inconsistent account of his presence at the scene. At some point, Deputy 1 stepped away and began to take another searching look into the cab and bed of Zeimer's truck, while Deputy 2 continued the questioning, resulting in Zeimer's eventual admission that he lied to conceal the embarrassing fact that he was currently without a home. Neither of the deputies disputed that admission, but it did not deter them from continuing to grill him about what they viewed as his suspicious presence at the truck stop, a line of questioning to which a more truthful answer was in any event still not likely to aid in the assessment of whether he was in fact impaired by drugs or alcohol in furtherance of the original justification for the stop.

54

¶42　The body-cam recording clearly manifests that, from the outset of the stop throughout the deputies' intensive questioning up to that point, 15 minutes into the stop, Zeimer was cooperative, coherent, clear-speaking, and steady on his feet as he continued to stand at the front of his truck and answer questions. Up to that point, the recording manifests no indication that he was in fact intoxicated or otherwise impaired as a result of alcohol or drug use. On the one occasion that one of the deputies asked whether he had been drinking that morning or the night before, Zeimer answered, "no[]." The only perceived indication of impairment subsequently articulated by Deputy 1 at the hearing was what he initially perceived as Zeimer's "slurred or mumbled speech." However, the deputy's hearing assertion is not supported by the extensive body-cam recording which evinces no such objective indication.[24]

¶43　In response to the prosecutor's leading questioning at hearing, Deputy 1 testified that Zeimer's eyes appeared "constricted" after he removed his sunglasses.[25] However, in response to the prosecutor's follow-up question as to whether he "believe[d] that was a sign of impairment," the deputy answered only that it was "possible," not that he in fact suspected it as such. Moreover, aside from the deputy's failure to articulate that he actually perceived Zeimer's allegedly constricted pupils as a sign of impairment at the time, the

---

[24] The recording further manifests that, in response to Deputy 2's similar presumptive question about his speech pattern almost 20 minutes into the stop, Zeimer asserted and pointed out that he had no front teeth. Deputy 1 did not dispute that assertion at hearing and there is no indication to the contrary in the body-cam recording.

[25] The body-cam recording indicates that the deputies did not order Zeimer to remove his sunglasses until 14 minutes into the stop.

body-cam recording manifests that the encounter took place on a bright sunny morning. Neither the deputy, nor any other State evidence, provided any evidentiary basis asserting, much less establishing, a correlation between human pupil size, alcohol or drug use, and resulting impairment, particularly in the bright sunlight that was prevailing that day.

¶44 As noted in the District Court's findings, Deputy 1 testified that he was also suspicious that Zeimer may have been involved in some other unspecified criminal activity based on his observation that Zeimer "seemed nervous" during the questioning and that he suspiciously kept looking away and back at his truck for "long periods of time." However, the body-cam recording manifests only one instance in which Zeimer looked away and back at his truck, and then only in a quick glance back when his dog stood up in his truck cab as Deputy 2 moved around behind him to look into the driver's side window. Deputy 1 testified that he "didn't see any other signs" indicating that Zeimer was impaired and his body-cam recording simply manifests no speech pattern or manner, eye contact, lack of eye contact, or other personal behavior or condition indicative or suggestive of actual impairment, whether in isolation or in the aggregate. There is further no evidence that either of the deputies saw any open or unopen alcohol containers, drugs, drug paraphernalia, or other indication of alcohol or drug use in or about Zeimer's truck cab, bed, or any of the various items removed from his clothing during the purported protective pat-down search.

¶45 Upon a valid investigative traffic stop, unrelated questioning, including requests for proof of identification and checks for warrants, driver's license, vehicle registration, and insurance, *inter alia*, do not exceed the purpose, and reasonably-related scope and duration

of the investigation of the underlying purpose of the stop as long as "the unrelated question[ing] or [checking] does not substantially prolong the duration of the stop" beyond that reasonably necessary to diligently dispel or exhaust the predicate particularized suspicion of criminal activity that justified the stop. *Laster*, ¶ 49 (internal citations omitted); *Rodriguez v. United States*, 575 U.S. 348, 354-57, 135 S. Ct. 1609, 1614-16 (2015) (officer "may conduct certain unrelated checks during an otherwise lawful traffic stop" but "may not do so in a way that prolongs the stop[] absent the reasonable suspicion ordinarily demanded to justify detaining an individual"—internal citations omitted). *Accord State v. Snell*, 2004 MT 269, ¶¶ 16-17, 323 Mont. 157, 99 P.3d 191 ("additional justification" not required for request for unrelated consent to search incident to otherwise valid investigative traffic stop); *State v. Clark*, 2008 MT 419, ¶¶ 24-25, 347 Mont. 354, 198 P.3d 809 (unrelated request for consent to search vehicle after initial domestic abuse suspicion was dispelled did not unlawfully prolong the stop where subject voluntarily consented, duration of the stop was already lawfully prolonged on probable cause of traffic violations, and the request for consent was immediately incident thereto); *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009) (officer inquiry into matter unrelated to justification for initial traffic stop not unreasonable as long as the unrelated inquiry does "not measurably extend the duration of the stop"); *Royer*, 460 U.S. at 502, 103 S. Ct. at 1326-27 (noting that officers would have been justified in asking for consent to search luggage without particularized suspicion without exceeding permissible scope of initial stop had they not substantially extended the duration and scope of the intrusion by directing subject to isolated police room for additional questioning). However, absent new

57

or particularized suspicion of criminal activity that may arise during the lawful scope and duration of the initial purpose of an otherwise valid stop, such unrelated questioning and checks exceed the lawful scope and duration of the underlying stop at the point that they substantially prolong the stop beyond that reasonably necessary to diligently dispel or exhaust the original particularized suspicion that justified the stop. *See Laster*, ¶ 49 (internal citations omitted); *Snell*, ¶¶ 16-17; *Rodriguez*, 575 U.S. at 354-55 and 357-58, 135 S. Ct. at 1614-16 (internal citations omitted); *Johnson*, 555 U.S. at 333, 129 S. Ct. at 788; *United States v. Brignoni-Ponce*, 422 U.S. 873, 882, 95 S. Ct. 2574, 2580 (1975) ("any further detention or search" after the initial particularized suspicion for a stop is dispelled "must be based on *consent* or" new or expanded constitutional grounds— emphasis added).

¶46    Here, the initial particularized suspicion of DUI that initially justified the stop soon dead-ended based on Zeimer's denial of alcohol use and the deputy's failure to observe any confirmatory indicia of alcohol or drug use, much less actual impairment. Whether viewed as a secondary investigation of possible illegal drug distribution or possession, as apparent from the body-cam recording, or merely a more generic secondary investigation of Zeimer's odd, inconsistent, seemingly untruthful account of his presence and preceding activities, neither the deputy's body-cam recording, nor his subsequent hearing testimony, manifested anything more than a generalized suspicion or hunch that Zeimer may have been involved in some unspecified criminal activity other than DUI. Deputy 1 acknowledged as much in real time when the deputies first stepped away from Zeimer to consult and he told Deputy 2, "I tried smelling him for alcohol, I can't smell anything, but

58

I don't know." The deputies then returned and challenged Zeimer further with a series of questions as to whether he used any drugs the night before and, after he twice emphatically answered "no," continued to question him about what he did the night before. Still unsatisfied with his answers, the deputies stepped away to consult a second time at which point Deputy 2 advised that they were "still waiting" on a criminal history check, and "I think we *gotta either turn this thing . . . into a narcotics thing or DUI, I don't know, . . .* you could [inaudible] for [inaudible] an HGN or something." (Emphasis added.) Deputy 1 responded, "[i]t's your call, . . . I was trying to back you up." Regardless of the State's attempt to minimize it, the substance of the deputies' second consultation clearly manifests that they still did not think that they had developed any particularized information sufficient to either confirm their initial DUI suspicion or to support a particularized suspicion of some other type of criminal activity.

¶47 Approximately 16 minutes into the stop, the deputies returned to the patiently waiting Zeimer and began more directly pursuing the aforementioned "narcotics thing." Deputy 2 asked Zeimer a series of questions as to whether he had various types of illegal drugs in his truck. When that series of questions dead-ended, Deputy 2 resumed challenging Zeimer about "lying to us." Manifesting their only generalized suspicion or hunch of unspecified criminal activity, the deputy then presumptively asked Zeimer whether it "seem[s] odd" that, since he was "lying" to them and "can't give us a good answer," "somebody would do that if they're not doing anything that they're not supposed to be doing?" Zeimer emphatically answered, "I'm not lying."

¶48    With the "narcotics thing" having again dead-ended, Deputy 2 resorted back to the original DUI investigation by asking the loaded presumptive question, "do you usually talk slow and slurred and tired sounding?"  Aside from the fact that the body-cam recording does not support either assertion, Zeimer pointed out that he did not "have any teeth in the front" of his mouth.  Deputy 2 accepted that answer without challenge, and again asked whether Zeimer "use[d] anything last night" or that morning, and what he was doing the night before.  Zeimer again answered "no," and that he was just "[d]riving around."  Deputy 2 then said, "[o]k . . ., *just so I can rule out* the fact that you *could be intoxicated*, I'm just going to run, run a couple of [field sobriety] tests on ya." (Emphasis added.)  Thus, only after 20 minutes into the stop, and the deputies' manifest failure to develop any confirmatory particularized indicia of actual impairment or any other criminal activity, did they finally subject Zeimer to standard field sobriety testing to confirm or dispel the original particularized suspicion of DUI—the sole justification for the stop in the first place.

¶49    For sake of argument, we will assume that the deputies' failure to observe any specific record-supported post-stop facts or circumstance either confirming Deputy 1's pre-stop DUI suspicion, or giving rise to a new or expanded particularized suspicion of some other particular criminal activity, did not earlier dispel the original justification and thus end the lawful duration of the stop.  We further note that the order of investigative progression between the original purpose of a stop and some permissible incidental questioning or checking regarding an unrelated matter is not necessarily determinative of whether the officer unlawfully prolonged the stop, as long as the officer does not

60

substantially prolong the duration of the stop beyond the time necessary to confirm or dispel the justifying particularized suspicion of criminal activity with reasonable diligence. *See Rodriguez*, 575 U.S. at 354-55 and 357-58, 135 S. Ct. at 1616. We thus recognize here that a reasonably *brief* transition and departure from the deputies' originally justified DUI investigation to an unrelated line of questioning would not have necessarily precluded them from returning to the DUI investigation and confirmatory field sobriety testing, if they had completed or exhausted the original DUI investigation with reasonable diligence.

¶50 However, the primary, if not exclusive, manifest purpose of the deputies' transition from the initially-justified DUI stop was to extensively interrogate Zeimer regarding his odd, inconsistent, and seemingly deceptive account of his presence and preceding activities, based on their only generalized suspicion of some other illegal activity (e.g., illegal drug possession or distribution). As asserted by Deputy 1 at hearing and found by the District Court, the justification for that investigative detour was no more than his articulated observation of Zeimer as nervous and nervously looking back or away from the deputy during the ongoing questioning regarding that non-DUI-related matter. In that regard, we recognize that otherwise perfectly legal or innocuous conduct or behavior may be a contributing factor in giving rise to a particularized suspicion of criminal activity in conjunction with other specific indicia of criminal activity. *See Flynn*, ¶ 11 (particularized suspicion requirement does not require officers to "consider every possible innocent explanation" for the subject's conduct or circumstance); *State v. McMaster*, 2008 MT 294, ¶¶ 15-23, 345 Mont. 408, 191 P.3d 443 (a series of odd but innocent actions at Town Pump store sufficient to contribute to a particularized suspicion of illegal drug activity in

conjunction with articulated police knowledge that subject was a major out-of-town drug dealer, the store "was a location known for drug deals" and experienced officer observations of defendant's erratic driving like he was looking to meet somebody outside of town and multiple individuals outside their vehicles "rubber-necking" at or for police before exchanging a box); *Wardlow*, 528 U.S. at 121-22 and 124-25, 120 S. Ct. at 674-76 (noting "nervous, evasive behavior" may be "a pertinent factor" supporting a particularized suspicion of criminal activity in conjunction with other particularized indica of criminal activity and thus holding that the subject's "[h]eadlong flight" upon seeing approaching police vehicles was a contributing factor supporting a particularized suspicion of illegal drug activity under the totality of the circumstances that also included the subject's presence "in an area known for heavy narcotics trafficking" while "standing next to [a] building carrying an opaque bag"). Even a series of otherwise lawful or innocuous acts may together support a reasonable particularized suspicion of criminal activity if coupled with an articulated and objectively reasonable officer inference, based on the officer's training or experience, that the otherwise lawful or innocuous conduct and attendant circumstances are together indicative of some *particular* type of criminal activity. *See United States v. Arvizu*, 534 U.S. 266, 274-75 and 277-78, 122 S. Ct. 744, 751-53 (2002) (particularized suspicion requirement does not require officers to "rule out the possibility of innocent conduct"—*inter alia* citing *Terry*, 392 U.S. at 22, 88 S. Ct. at 1880-81 (noting that "a series of acts, each of them perhaps innocent" if viewed separately may warrant further investigation "if taken together")); *United States v. Sokolow*, 490 U.S. 1, 8, and 9, 109 S. Ct. 1581, 1586 (1989) (holding that, though any one of the articulated facts would

be "quite consistent with innocent travel," the purchase of thousands of dollars of airline tickets from a roll of $20 bills for a short-duration trip from Honolulu to Miami in July were sufficient together with various other "probablistic" factors to support a reasonable particularized suspicion of illegal drug activity). However, without reasonable officer-articulated inferences of some *particular* criminal activity, merely inconsistent accounts of a person's conduct or presence, nervous or defensive behavior when monitored or confronted by police, or the desire to avoid or evade oncoming police are insufficient to support a reasonable *particularized* suspicion of *any particular* criminal activity. *See Harning*, ¶¶ 19-20, 24-26, and 28-29 (holding that "[n]ervous behavior during a traffic stop is not uncommon and d[id] not establish particularized suspicion to extend a traffic stop into a drug investigation" of the vehicle—trooper "unlawfully extended" the speeding-based traffic stop because his articulated observations of a marijuana odor, the subject's admission of earlier smoking marijuana in another location, lack of indication of impairment, "nervous" and "evasive" behavior," "hesitant answers," "hemming and hawing," failure to roll down his window, and that people pulled-over generally "don't act like that" were insufficient without articulation of additional "objective data" to support a new or expanded reasonable particularized suspicion that the subject's vehicle contained marijuana); *Driscoll*, ¶¶ 5-8, 14, and 15 (holding that observation of youthful-looking subject "acting defensively" when confronted by officers while holding a beer can in a bar was not a sufficient particularized basis upon which to prolong the underage drinking investigatory stop where they failed to articulate any additional facts supporting their continued suspicion that he was underage after he told them he was 22 years old); *Martinez*,

63

¶ 62 ("innocuous conduct may be used in the calculus" of particularized suspicion of criminal activity in conjunction with other objective facts but is insufficient alone); *State v. Fisher*, 2002 MT 335, ¶¶ 3-5, 15, and 18-21, 313 Mont. 274, 60 P.3d 1004 (holding that subject's presence in a "high-crime area" in Billings and accompanying "'nervous and evasive' driving" upon seeing an approaching police car was insufficient to support a particularized suspicion that he was either one of the "three or four people" reportedly "on foot in an alley" with "a gun" or otherwise involved in some other criminal activity—noting that subject "made an entirely legal and ordinary turn [away from the police car] on a public street" and that there was no evidence that the officer saw any "nervous and evasive" behavior by the subject himself or that he was engaged in "headlong flight" or other "consummate act of evasion"); *State v. Broken Rope*, 278 Mont. 427, 432, 925 P.2d 1157, 1160 (1996) (noting that "there is nothing inherently suspicious" about a person "moving around in a convenience store parking lot, . . . staring at" a police officer, or being or appearing "nervous" when being watched by or in the presence of a police officer and further noting that "many law-abiding citizens may well be nervous when their activities are being watched by law enforcement officers"); *Gonzalez*, 328 F.3d at 758 ("mere 'uneasy feelings' and inconsistent stories" are insufficient alone to support a reasonable particularized suspicion of criminal activity).

¶51     Here, after 20 minutes of intensive questioning and repeated searching looks into Zeimer's truck, the deputies had yet to subject him to field sobriety testing to confirm or dispel their original DUI suspicion.  A manifest and only generalized suspicion of some other unspecified criminal activity drove both the initial 20-minute investigative detour,

64

which was at most only briefly and tangentially related to the DUI-confirmatory purpose of the stop, and the additional 17-minute delay *after* completion of the belated field sobriety testing, purportedly for further DUI investigation, but which actually involved the time taken to ask for consent and then search Zeimer's truck for something that could not possibly aid in assessing whether he was in fact alcohol or drug impaired. Neither the field body-cam and dash-cam recordings admitted into evidence, nor Deputy 1's subsequent hearing testimony, manifest any articulated, particularized post-stop indicia of actual impairment for purposes of DUI, whether based on how Deputy 2 may have scored Zeimer's performance on the field sobriety tests as an indicator of alcohol or drug related impairment, or otherwise. Deputy 1's hearing testimony was further devoid of any explanation or apparent reason why they did not earlier proceed with field sobriety testing based on his stated initial particularized suspicion of DUI. The body-cam recording, including the perplexed nature of the deputies' on-scene consultations and strategizing before two additional runs at Zeimer, manifest that the deputies neither proceeded with reasonable diligence to confirm or dispel the original particularized suspicion of DUI that justified the stop, nor developed any new or expanded reasonable particularized suspicion of some other criminal activity.

¶52 Except for strained analogy to cases involving fact patterns distinctly different from the particular record facts and circumstances in this case, the State has provided no constitutional, officer-articulated justification for prolonging the initial DUI traffic stop for over 20 minutes while the officers grilled Zeimer about his odd, inconsistent, and only generally suspicious account of his presence and prior activity instead of more diligently

65

proceeding with field sobriety testing to either confirm or dispel the initial particularized suspicion of DUI. Based on the particular evidentiary record in case, we hold that the deputies unlawfully prolonged the duration of the initially valid investigative DUI stop before subjecting Zeimer to the confirmatory DUI field sobriety testing, that was the sole justification for the stop, over 20 minutes into the stop.

¶53 The State asserts that Zeimer waived the right to assert that the deputies unconstitutionally prolonged the duration of the stop because his suppression motion and briefing narrowly focused on whether the stop was a valid CCD stop. However, the primary focus of the State's evidentiary showing and argument in defense of the stop was on the constitutional validity of the stop as a *Terry* investigative stop for purposes of confirmatory DUI investigation, namely field sobriety testing. Tracking the course and scope of the parties' dispute at hearing, the District Court ultimately concluded that Deputy 1 "was warranted *in continuing to engage* [Zeimer] in conversation *based upon information discovered from the stop, itself.*" (Emphasis added.) *Inter alia*, the court's written ruling quoted *Kroschel*, ¶ 19 (noting that investigating officer "may develop new or broader particularized suspicion of criminal activity justifying the expansion of the scope or duration of the stop beyond that justified by the officer's initial observations" "[b]ased on additional information developed during the initial lawful duration and scope of [the] initial investigative stop"). The dispositive issue actually litigated by the parties at hearing and adjudicated by the court thus encompassed the essence of Zeimer's assertion of error on appeal. We therefore reject the State's assertion of procedural waiver.

66

Application of Exclusionary Rule

¶54   Pursuant to the exclusionary rule, also known as the "fruit of the poisonous tree" doctrine, evidence discovered as the result of a constitutionally invalid search or seizure is generally inadmissible against the accused in subsequent proceedings. *Laster*, ¶ 35 (internal citations omitted); *State v. Hilgendorf*, 2009 MT 158, ¶ 23, 350 Mont. 412, 208 P.3d 401 (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 416 (1963)); *State v. Pipkin*, 1998 MT 143, ¶ 12, 289 Mont. 240, 961 P.2d 733 (citing *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684 (1961) and *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974)); *Murray v. United States*, 487 U.S. 533, 536-37, 108 S. Ct. 2529, 2533 (1988) (internal citations omitted).   The exclusionary rule is the "principal mode of discouraging lawless police conduct." *Terry*, 392 U.S. at 12, 88 S. Ct. at 1875. Its primary narrow purpose is to "deter[] government agents from acquiring evidence via violation of constitutional rights." *Laster*, ¶ 35 (citing *State v. Courville*, 2002 MT 330, ¶ 20, 313 Mont. 218, 61 P.3d 749).   *See also State v. Malkuch*, 2007 MT 60, ¶ 13, 336 Mont. 219, 154 P.3d 558  (2007) ("The purpose of the exclusionary rule is to 'deter illegal police conduct and to preserve judicial integrity.'"—quoting *State v. Long*, 216 Mont. 65, 71, 700 P.2d 153, 157 (1985)).   As applicable here, the rule generally precludes the government from prosecuting an accused with evidence obtained as a direct or indirect result of exploitation of a government violation of an accused's constitutional rights. *Laster*, ¶ 35 (citing *Murray*, 487 U.S. at 536-37, 108 S. Ct. at 2533; *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 3385 (1984); and *Wong Sun*, 371 U.S. at 487-88, 83 S. Ct. at 417)); *State v. Therriault*, 2000 MT 286, ¶ 57, 302 Mont. 189, 14 P.3d 444.  Upon

adjudication that the subject evidence was discovered as a result of an unlawful search or seizure, the State has the burden of demonstrating that the exclusionary rule does not apply by its terms in a particular case or, "beyond mere speculation and assumption," that a recognized exception applies and precludes exclusion. *Laster*, ¶ 36 (internal punctuation and citations omitted); *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261-62 (1975).[26]

¶55 As he did below as pertinent, Zeimer essentially asserts that the incriminating evidence seized from his truck was subject to suppression because the search and resulting discovery would not have occurred but for the fact and circumstances of his unlawfully prolonged investigatory detention without a warrant or probable cause. The State counters only that he procedurally waived that assertion and that the stop was in any event lawful in duration and scope. In the absence of any assertion and supporting showing by the State that the truck search was the product of Zeimer's free will *independent of* the unlawfully prolonged duration of the original DUI stop, we hold that the exclusionary rule is applicable and requires exclusion here. *See Royer*, 460 U.S. at 501 and 507-08, 103 S. Ct. at 1325 and 1329 (noting that incriminating "statements given during a period of illegal detention are inadmissible even [if] voluntarily given" unless they were "the result of an independent act of free will"—holding that drug evidence seized pursuant to consensual airport luggage

---

[26] For recognized exceptions to the rule, see, e.g., *Laster*, ¶ 36 (independent source and inevitable discovery exceptions—internal citations omitted); *State v. New*, 276 Mont. 529, 536, 917 P.2d 919, 923 (1996) (noting exceptions for when the discovery of the subject evidence was so "attenuated from the constitutional violation so as to remove its primary taint").

search after "the bounds of [the] investigative stop had been exceeded" was "tainted by illegality" and subject to exclusion). *Compare Laster*, ¶¶ 46-49 (holding that, despite the causal connection with police discovery of illegal drug evidence in the pocket of subject's clothing as a result of an unlawful pat-down search and seizure, the independent source exception to the exclusionary rule precluded suppression of the drug evidence discovered in the subsequent consensual vehicle search where the unrelated questioning did not substantially prolong the stop and the record manifested that the vehicle search "was primarily the result of . . . [an] intervening free will choice" rather than officer coercion, duress, or exploitation of the prior illegal pat-down search). We thus hold that the District Court erroneously denied Zeimer's motion for suppression of the incriminating evidence upon which his underlying criminal convictions are based.

**CONCLUSION**

¶56 We hold that the District Court correctly concluded that Deputy 1 lawfully stopped and detained Zeimer on a reasonable particularized suspicion of DUI. Based on the particular evidentiary record in this case, we hold further, however, that the deputies thereafter unlawfully prolonged the duration of the initially valid investigative DUI stop before subjecting Zeimer to the confirmatory DUI field sobriety testing, which was the sole asserted justification for the stop, over 20 minutes into the stop. Based on the particular evidentiary record in this case, we thus ultimately hold that the subject illegal drug evidence at issue was subject to suppression pursuant to the exclusionary rules as evidence discovered and seized as a direct result of police exploitation of an unlawfully prolonged warrantless investigative stop. Zeimer's December 2020 convictions on the offenses of

69

felony Criminal Possession of Dangerous Drugs (methamphetamine) and misdemeanor Criminal Possession of Drug paraphernalia are therefore hereby reversed.

/S/ DIRK M. SANDEFUR

We concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON